KETHLEDGE, J., delivered the opinion of the court, in which BATCHELDER, C.J., and BOGGS, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, *515 GRIFFIN, and DONALD, JJ., joined. CLAY, J. (pp. 535-37), delivered a separate opinion concurring in the judgment only, in which COLE, J., joined. MOORE, J. (pp. 537-55), delivered a separate dissenting opinion, in which MARTIN, WHITE, and STRANCH, JJ., joined.
OPINION
KETHLEDGE, Circuit Judge.
Marvin Gabrion was scheduled to be tried in Michigan state court for a rape charge on June 5, 1997. But that trial never happened. Two days before the trial was set to begin, Gabrion abducted Rachel Timmerman — the 19-year-old woman he allegedly raped — and took her to a remote location in the Manistee National Forest, bound and gagged her and weighed her down with concrete blocks, put her in an old metal boat, and then threw her overboard, alive, into a shallow, weedy lake, where she drowned. Gabrion also abducted and killed Timmerman’s infant daughter.
Timmerman’s murder was a federal offense because it occurred in a National Forest. See 18 U.S.C. § 1111(b). A federal jury later convicted Gabrion of murder and recommended that he be sentenced to death. The district court sentenced him accordingly. Gabrion now challenges his conviction and sentence on numerous grounds. We reject all of his arguments, and affirm.
I.
A.
On the morning of August 7, 1996, Rachel Timmerman arrived at her mother’s trailer home in Newaygo County, Michigan, hysterical and bleeding from a laceration on her nose. She said that a man named Marvin Gabrion had raped her the night before. Timmerman was then 19 years old and had given birth to a baby girl, Shannon Verhage, just six weeks earlier. Rachel told her mother that she was afraid to press charges because Gabrion had said that, if she did, he would kill both her and her baby. But that afternoon Rachel reported the rape to the Newaygo County Sheriff. Two months later, the county prosecutor charged Gabrion with the rape. For the next three months, however, the police were unable to find him.
On January 20, 1997, the Sheriffs deputies found and arrested Gabrion. They gave him an arrest warrant that named three witnesses for the rape charge: Tim-merman herself; Wayne Davis, an associate of Gabrion’s who had been with him the night of the rape; and Gabrion’s teenaged nephew, Mikey Gabrion. Marvin Ga-brion was jailed after his arrest, but was released after a friend (to whom Gabrion said he was jailed for DUI) posted bond for him on February 3,1997.
Timmerman herself was in jail for a minor drug charge when Gabrion was released, but another witness, Davis, was free for the time being. Within days of Gabrion’s release, Gabrion made his way to Davis’s residence in White Cloud, Michigan. Davis himself was set to report to jail on February 13 for a 90-day term resulting from a DUI charge. His friend Darlene Lazo had agreed to drive Davis to jail that morning. The afternoon before Davis was scheduled to report, Lazo encountered Gabrion at Davis’s home, working on a car. When Lazo arrived the next morning to give Davis a ride to jail, he was missing. Left behind, on a kitchen chair, was an army jacket that Davis always wore. His personal effects in the house likewise seemed untouched, except that his stereo equipment was missing. Davis was never seen alive again. A few weeks after *516 Davis’s disappearance, Gabrion tried to sell Davis’s stereo equipment at a local consignment shop, with the serial numbers ground off.
On May 5 Timmerman was released from jail. Twice that month she encountered Gabrion and called the Sheriffs office in a panic afterwards, saying that she thought he would kill her. Meanwhile, a young friend of Gabrion’s, John Weeks, repeatedly called Timmerman to ask her on a date. Rachel did not know that Weeks was calling at Gabrion’s direction. Finally, on June 3 — two days before Ga-brion’s rape trial was set to begin — Rachel told her father that a boy had invited her to dinner that night, and that she would be home in a couple of hours. She said she was bringing her baby along because the boy had specifically asked her to. Rachel’s father never saw either of them alive again.
The day after Timmerman’s disappearance, several other people saw her with Gabrion and another man in the vicinity of Oxford Lake, which lies partly in the Man-istee National Forest. In early June— almost certainly on June 4 — -Bonnie Robinson was driving away from her farm in the vicinity of Oxford Lake. As she approached a one-lane bridge, she encountered an old pickup truck driving fast the other way, towards the lake. Inside the truck were two men with a large blond woman (a description matching Rachel) sitting between them. The driver “seemed to be very angry about something.” A metal boat was sticking out of the truck’s bed.
Kathy Kirk similarly testified that she and her mother had parked at Oxford Lake, near the mud ramp, when an old pickup truck with a boat sticking out the back pulled up alongside them. Gabrion was driving and a young blond woman (whose photo Kirk later saw on the news) was sitting between him and another man (who was almost certainly Weeks). Twice the blond woman looked up at Kirk, and then looked down again. Soon Kirk and her mother drove off.
Finally, again on June 4, Pearl and Bob Hall were driving along a narrow two-track road towards Oxford Lake. As they got near the lake, an old pickup truck with a boat sticking out came fast the other way. This time Gabrion was driving alone, looking “like he was really mad. He was just glaring.” Hall had to pull off into the bushes to avoid a collision. As Gabrion drove past, “it sounded like there was stuff in the boat to make it rattle.” When the Halls got down to the lake, they saw marks in the mud ramp where someone had recently dragged out a boat.
One evening later that same week, Ga-brion and John Weeks approached several campers at a nearby campground. Ga-brion introduced himself as Lance (an alias he frequently used) and asked whether he could store his boat at the other campers’ site, explaining that his own site was too crowded to keep it there. They agreed. One of the campers, Dan Basset, said that Gabrion was “skittish, nervous, didn’t talk much.” Basset also said that Gabrion “always wore gloves[,]” even though it was warm out. Basset later came upon Ga-brion’s campsite while looking for firewood. Gabrion was standing by the fire, with gloves on. The campsite was nowhere near the area where Gabrion had said it was, and had plenty of room to store a boat.
Around 3:30 a.m. on June 6 — two days after Gabrion was seen with Timmerman near Oxford Lake — one of Gabrion’s neighbors in town, Trevor Zylstra, awoke to the sound of “a very loud bang[J” Zylstra looked out the window and saw Gabrion dragging a metal boat on his gravel driveway. Once Gabrion got the boat to the side of the garage, Zylstra saw him *517 remove two life vests, three concrete blocks, and a length of chain. Then Ga-brion pulled the boat into the garage and ground off the boat’s registration numbers.
Almost a month later — on July 5,1997— Douglas Sortor and his son-in-law Nathan prepared to launch a small fishing boat at the same ramp that Gabrion had visited. They saw an object floating about 100 yards offshore. They looked at the object through binoculars and thought it appeared to be a human torso. They decided to investigate. The weeds between the ramp and the object were too thick to row through, so Sortor rowed to the South and then circled back towards the object. As they came close, they saw feet protruding from the water. Sortor said they hoped it was “a dummy” of some kind. Then the odor hit them and they realized the object was a human body. It was Rachel’s. The body was face-up with a concrete block attached to the front, near the waist. The body was fully clothed. Rachel’s left leg and waist were tightly bound with a shiny metal chain and two padlocks. A second concrete block was also attached to the body through the chain. Rachel’s wrists were handcuffed tightly behind her back. Her eyes and mouth were bound with duct tape; her nose had been left uncovered. The water in that area was about 3 feet deep, with 82 feet of soft muck beneath. About one-third of the body was covered in muck. The body had surfaced as a result of bacterial gassing.
Gabrion’s whereabouts at that time were unknown, but the police promptly began investigating him as a suspect. They executed a search warrant at his residence and found two keys that matched the padlocks on Rachel’s body. They also found concrete blocks that were stained with the same tar and paint materials as the blocks attached to Rachel’s body. Gabrion’s nephew, Mikey, led Sheriffs deputies to a campsite that his uncle frequently used. The site was north of Oxford Lake, down a two-track in a dense, remote area. Gabrion’s tent was still pitched there. Scattered about they found bolt cutters, another length of shiny chain, duct tape, a woman’s hair clip, and silicone nipples for a baby bottle.
Meanwhile, the FBI in upstate New York were already investigating Gabrion in connection with the theft of social-security benefits belonging to a mentally disabled man from Grand Rapids, Michigan, named Robert Allen. Allen had disappeared in 1995 and was never seen again. Shortly after his disappearance a man who identified himself as Allen — but whom a post-office employee later identified as Ga-brion — opened a post office box in Sherman, New York and directed that Allen’s benefit check be sent there each month. Gabrion also signed over one of Allen’s checks as payment for rent in early 1996. In October 1997, the Detroit FBI got word that Gabrion was headed to Sherman to collect Allen’s check for that month. An FBI SWAT team staked out the Sherman post office on October 14. When Gabrion arrived, the agents arrested him. He was carrying a Virginia driver’s license in the name of Ronald Lee Strevels at the time.
The body of Timmerman’s 11-month old daughter, Shannon Verhage, has never been found. But it is virtually undisputed that Gabrion killed her. While awaiting trial for Rachel’s murder, Gabrion gave another prisoner a map of Oxford Lake, on which he had written, “body of 3, 1 found.” While incarcerated, Gabrion also told two inmates that he “killed the baby because there was nowhere else to put it.”
B.
The government indicted Gabrion for violating 18 U.S.C. § 1111, which prohibits murder “[wjithin the special maritime and *518 territorial jurisdiction of the United States[.]” The government also notified Gabrion that it would seek the death penalty.
Gabrion went to trial on February 25, 2002. On March 5, the jury found him guilty of first-degree murder. The trial then entered the penalty phase. (That is the phase during which the government and defendant submit evidence as to circumstances of the offense or aspects of the defendant’s background that “aggravate” for or “mitigate” against the death penalty.)
A total of 58 witnesses testified in support of the government’s allegations during the penalty phase of the trial. Some of the testimony concerned the depraved manner of the murder itself — including the terror that Timmerman must have felt as Gabrion rowed her 100 yards out onto the water, the boat rocking as she lay inside it, blinded, bound, gagged, and weighed down with concrete blocks. Other testimony concerned the likelihood that Gabrion killed Timmerman’s baby, Shannon Ver-hage. Still other testimony concerned Ga-brion’s character and future dangerousness. Some of that testimony pointed to Gabrion’s likely role in the disappearance (and presumably murder) of three other people. One was Wayne Davis, the only witness to Timmerman’s rape (other than Gabrion’s nephew and Timmerman herself), who was last seen with Gabrion before Davis disappeared, and whose stereo equipment Gabrion tried to sell several weeks later. Another was John Weeks, who was likely the only witness to Tim-merman’s murder, and who himself disappeared about 18 days later — never to be seen again — after telling his girlfriend that he was going on a “dope run” to Texas with Gabrion. (Gabrion later told Weeks’s girlfriend that he had dropped off Weeks with some friends in Arizona.) The third was Robert Allen, the mentally disabled man who crossed Gabrion’s path in Grand Rapids and then vanished in 1995, just before Gabrion assumed his identity and began stealing his disability checks.
Numerous other witnesses testified to Gabrion’s propensity for violence. Two witnesses described how each of their homes had been set afire shortly after a disagreement with Gabrion. Another witness described how Gabrion began shooting a bolt-action rifle towards his house after he told Gabrion to leave a party there. (The investigating police officer found Gabrion passed out in a trailer with the rifle hanging above him on the wall and spent casings on the hood of his pickup truck outside.) Another witness described how Gabrion trained a rifle on her and her two-year old child as she walked to her ear one day, and then climbed into his car and followed them for miles. Another woman testified as to how Gabrion sexually assaulted her in her home. Another witness testified that Gabrion beat and kicked him, punched his wife in the face, and then punched his teenaged son, after the witness interrupted a card game to retrieve heart medicine for the witness’s uncle. Another witness testified that Ga-brion said he could “snipe” everyone in the neighborhood from his second-story window. One night this same witness heard a gunshot, looked out the window and saw a red muzzle flash from Gabrion’s window just before the crack of a second shot. This witness found a bullet embedded in his home afterwards.
Other testimony showed that Gabrion had been a busy inmate while awaiting trial. He carved a fake gun from soap, painted it black, and planned to use it in an escape attempt. In separate phone calls, he impersonated a state senator and court officials in an attempt to transfer to another jail. He obtained hypodermic needles, *519 razor blades, and a claw made from a metal shower ring, among other contraband. Gabrion also placed dozens of calls to Shannon Verhage’s paternal grandmother, accusing her of killing Rachel and Shannon. And Gabrion wrote numerous letters to Rachel’s father, saying he knew where the baby was and asking for a photo of her. In desperation, apparently,. Rachel’s father eventually sent him one, which Gabrion then used for sexual gratification.
After the prosecution finished with its proofs, Gabrion offered mitigation evidence. Dr. Douglas Sharre asserted that Gabrion had been in “multiple motor vehicle accidents” that allegedly damaged Ga-brion’s brain. Dr. Newton Jackson testified that Gabrion had been subject to “negative influences” as a child, including violence and alcohol abuse by his parents. Dr. Jackson also testified that Gabrion displayed “some histrionic personality features where there is exaggeration and the desire to be the center of attention.” (Ga-brion testified three times at trial.) Dr. Jackson said “[tjhere’s also antisocial features where he has a history of arrests and heedless disregard for his own safety and that of others, a lack of empathy for others.” Dr. Jackson said that Gabrion also displayed narcissistic features, and that his relationships with other people largely took “the form of using other people to satisfy his own desires.” But Dr. Jackson said that “I don’t view Mr. Gabrion as mentally ill” and that Gabrion was engaged in “some malingering[,]” ie., faking his symptoms.
The government presented evidence in rebuttal. It first called the driver in one of Gabrion’s alleged car accidents, who testified that Gabrion had faked his injuries. A neurologist testified that he had reviewed Gabrion’s medical records and found no evidence of any brain injury. A clinical neuropsychologist, Dr. Thomas Ryan, offered the same conclusion. Dr. Ryan also tested Gabrion and believed that Gabrion was faking his impairments. He explained the results of one test as follows:
A: [0]n one particular malingering test, which is what we call a forced choice measure, meaning that the person is forced to choose between one of two items, Mr. Gabrion was shown a series of 50 common objects. As soon as that was through, I then showed him another plate of cards, one of which was the item he had just seen, one was one he had never seen. So basically he was forced to choose which one he had just seen. Now, blindly guessing would give you a score of approximately 25 out of 50.
A: And there were three trials with the same exact figures on each trial. That is called the test of memory malingering. On trial one he got a score of 32, and the authors of that test suggest that anything below a score of 45 indicates malingering, particularly on trial two, because this person who developed the test developed it on individuals with very severe injuries, people who have had aneurysms burst, people who’ve had severe brain injuries, people who have been in coma for three months. So brain-injured individuals generally get a score of about 44 or 45.
Q: Are you saying you gave this test three times?
A: No — yes, I administered — there’s three administrations.
Q: What did he get for each test?
A: On trial one he got a score of 32.
Q: What about trial two?
*520 A: On trial two he got a score of 26,.so he did worse.
Q: How about trial three?
A: Now, again, these are the same stimulus items, so on trial two he got worse. He performed more poorly. And then on the retention trial he got a score of 21. So this indicates to me that he knew the right answer, but was intentionally giving me the wrong answer.
Q: Is that also true — I’m not going to go into the next test, but is that also true of the other tests that you gave him?
A: Yes.
Dr. Gregory Saathoff, a clinical psychologist, likewise testified that Gabrion was malingering. He also said that Gabrion displayed anger towards women.
The jury returned its penalty verdict on March 16, 2002. They found unanimously that the government had proved two statutory aggravating factors beyond a reasonable doubt: first, that Gabrion committed the murder in an especially heinous, cruel, and depraved manner; and second, that he committed the murder after substantial planning and premeditation. In addition, the jury unanimously found four nonstatu-tory aggravating factors beyond a reasonable doubt: that Gabrion presented a future danger, that Timmerman’s death caused a loss to her family and society, that Gabrion caused the death or disappearance of Shannon Verhage, and that Gabrion obstructed justice by murdering Rachel. One or more jurors also found the following mitigating factors by a preponderance of the evidence: that Gabrion had an impoverished and abusive childhood, that he had a lack of parental guidance, that his upbringing contributed to his criminal conduct, that he did not have a record of disciplinary infractions in school, that he engaged in substance abuse, that he had personality disorders, and that the loss of Gabrion’s life would be significant to his family. The jury also found that the aggravating factors sufficiently outweighed the mitigating ones to justify a sentence of death. The district court sentenced Ga-brion accordingly. See generally 18 U.S.C. § 3593(a).
Gabrion appealed. Among other challenges, Gabrion argued (and here we mean that literally — for Gabrion came up with the argument himself) that the federal government lacked jurisdiction over Tim-merman’s murder. A divided panel of this court rejected this argument in a separate opinion. See 517 F.3d 839. Thereafter, the panel addressed Gabrion’s remaining claims and unanimously rejected 20 of them. Over a dissent, however, two members of the panel vacated Gabrion’s death sentence on two grounds. See 648 F.3d 307. We granted the government’s petition to vacate the latter decision and rehear the case en banc.
II.
We begin with the three issues that were the focus of briefing and argument during our rehearing en banc.
A.
Gabrion argues that the murder’s location in Michigan — a State that lacks the death penalty — should have counted as a mitigating factor as that term is used under both the Eighth Amendment and the Federal Death Penalty Act. The district court disagreed, and excluded from the penalty phase of Gabrion’s trial any evidence or argument to the effect that the murder’s location in Michigan was somehow mitigating.
1.
We consider the Eighth Amendment question first. Gabrion’s briefs are *521 not clear as to why the murder’s location in a non-death penalty state is mitigating, other than to say that it would be “arbitrary” to execute him based upon the “geographic happenstance” that he murdered Rachel Timmerman in a National Forest. Gabrion Br. at 119-20. But it is clear that the murder’s location in Michigan is unlike any fact that the Supreme Court has ever recognized as mitigating. It is true, of course, that “the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence.” Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). But the question is what counts as “constitutionally relevant mitigating evidence.” Id.
A capital defendant’s “punishment must be tailored to his personal responsibility and moral guilt.” Enmund v. Florida, 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Accordingly, the two seminal eases that require the admission of mitigation evidence — Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) — are based upon “the principle that punishment should be directly related to the personal culpability of the criminal defendant.” Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), overruled on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
It comes as no surprise, therefore, that most of the evidence the Supreme Court has deemed mitigating was evidence relevant to the defendant’s personal culpability for his crime. That evidence includes, for example, evidence that the defendant was intoxicated at the time of his crime, Parker v. Dugger, 498 U.S. 308, 314, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); evidence that the defendant drove the getaway vehicle but did not participate in the murders themselves, Enmund, 458 U.S. at 786, 801, 102 S.Ct. 3368; evidence of the defendant’s “youth” and abusive “family history[,]” Eddings, 455 U.S. at 115, 102 S.Ct. 869; evidence of the defendant’s low IQ, Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004); evidence that the defendant suffered from depression, Brewer v. Quarterman, 550 U.S. 286, 289, 127 S.Ct. 1706, 167 L.Ed.2d 622 (2007); evidence that the defendant suffered from borderline personality disorder, Bobby v. Van Hook, 558 U.S. 4, 10-11, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009); evidence that the defendant was “shuttled from foster home to foster home[,]” Wiggins v. Smith, 539 U.S. 510, 525, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); and evidence that the defendant was sexually abused as a child, id. at 528, 123 S.Ct. 2527. The admission of much of this evidence reflects “the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.’ ” Penry, 492 U.S. at 319, 109 S.Ct. 2934 (quoting California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring)). Thus, to the extent relevant to the defendant’s culpability, mitigation evidence includes evidence about the defendant’s background and the circumstances of his crime. See Penry, 492 U.S. at 327-28, 109 S.Ct. 2934.
In addition to evidence concerning the defendant’s culpability, evidence of the defendant’s character can be mitigating. That evidence includes evidence that the defendant would be a well-behaved prisoner if not executed, Skipper v. South Carolina, 476 U.S. 1, 4-5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); evidence of the de *522 fendant’s military service, Porter v. McCollum, 558 U.S. 30, 39-40, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009); and evidence of the defendant’s religious conversion while in prison, Wong v. Belmontes, 558 U.S. 15, 20-21, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009). Viewed as a whole, therefore, mitigation evidence encompasses both culpability and character, all to the extent relevant to the defendant’s “personal responsibility and moral guilt.” Enmund, 458 U.S. at 801, 102 S.Ct. 3368. In summary: mitigation evidence is evidence relevant to “a reasoned moral response to the defendant’s background, character, and crime.” Penry, 492 U.S. at 319, 109 S.Ct. 2934 (emphasis omitted); see also United States v. Johnson, 223 F.3d 665, 675 (7th Cir.2000) (“A mitigating factor is a factor arguing against sentencing this defendant to death; it is not an argument against the death penalty in general”) (emphasis in original).
That Michigan lacks a death penalty has nothing to do with these things. It has nothing to do with Gabrion’s background or character. It has nothing to do with the reasons why he chose to kill Rachel Timmerman. It has nothing to do with the utter depravity of the manner in which he killed her. And above all it has nothing to do with his culpability for that offense or with any other consideration the Supreme Court has ever flagged as mitigating. Gabrion does not even argue the contrary.
Gabrion does assert that “[t]he simple fact that 227 feet was the difference between a life sentence and a potential death sentence may have been viewed as mitigating by one or more jurors.” Gabrion Br. at 120. But mitigation under the Eighth Amendment is not a matter of geographic coordinates. That Gabrion would not have been subject to the death penalty if only he had rowed his boat 228 feet to the north, beyond the boundary of the Manis-tee National Forest, before throwing Rachel Timmerman overboard, is not mitigating — for the same reasons that Michigan’s lack of a death penalty is not mitigating. (See the preceding paragraph.) Nor does the boundary’s proximity become mitigating based on Gabrion’s speculation about what a single juror might have thought about it. Mitigation evidence, as shown above, is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case. It is true that the Supreme Court has said that mitigation evidence includes evidence that “the sentencer could reasonably find ... warrants a sentence less than death.” Tennard v. Dretke, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (quotation marks omitted). But the key word there is “reasonably”; and read in the context of the rest of the Supreme Court’s mitigation-evidence case-law, and Penry in particular, that passage simply refers to evidence relevant to “a reasoned moral response to the defendant’s background, character, and crime.” Penry, 492 U.S. at 319, 109 S.Ct. 2934. Otherwise, for example, the Eighth Amendment would compel admission of evidence regarding the positions of the planets and moons at the time of the defendant’s offense — so long as he can show that at least one juror is a firm believer in astrology. To read the Tennard passage (and others like it) in the manner that Gabrion suggests would be to transform mitigation from a moral concept to a predictive one, and make a caricature of the law. We decline the suggestion.
The dissent is mistaken, therefore, when it suggests that mitigation, for purposes of the Eighth Amendment, is not a moral concept. Of course it is, as the plain terms of the Supreme Court’s precedents make clear. See, e.g., Penry, 492 U.S. at 319, 109 S.Ct. 2934; Enmund, 458 U.S. at 801, *523 102 S.Ct. 3368. But that does not mean (as the dissent seems to fear) that judges must act as moral filters in determining whether evidence is mitigating for purposes of the Eighth Amendment. The Supreme Court has spared us that task, by itself identifying certain categories of evidence — broadly stated, culpability and character — that are morally significant and thus mitigating under the Eighth Amendment. Our task, therefore, is not ourselves to determine the moral significance of a particular fact, but rather to determine whether the fact falls within one of the morally significant bins that the Supreme Court has already identified. The geographic coordinates of Rachel Timmer-man’s murder fail that test.
■ The dissent’s response is that the location of Timmerman’s murder is a “circumstance of the offense.” That is true enough — so was the moonphase that day— but the dissent is mistaken to read those words in complete isolation from the Supreme Court’s statements as to why circumstances of the offense can be mitigating. On this point 'the Court has been reasonably clear: “it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant’s character or record or the circumstances of the offense.” Penny, 492 U.S. at 327-28, 109 S.Ct. 2934 (emphasis added). And even in Tennard — upon which the dissent mistakenly relies here — the Court said that mitigation evidence does not include evidence of “the circumstances of the crime [that] is unlikely to have any tendency to mitigate the defendant’s culpability.” 542 U.S. at 286, 124 S.Ct. 2562 (emphasis added).
The dissent’s reliance on Tennard is misplaced for another reason. There, Tennard sought to admit evidence of his low IQ, which is a type of evidence that the Supreme Court has identified as mitigating. See Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004). The definition of mitigating, therefore, was not the issue in Tennard. The issue, rather, was the definition of relevance: the Fifth Circuit had upheld the exclusion of Tennard’s evidence on grounds that it did not have a strong tendency (as opposed to any tendency, which is the usual relevance standard) to mitigate Tennard’s culpability for his crime. The Supreme Court reversed, stating that the Fifth Circuit’s test “is inconsistent with the standard we have adopted for relevance in the capital sentencing context.” 542 U.S. at 287, 124 S.Ct. 2562. So the Court reiterated that standard: “the ‘meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding’ than in any other context[.]” Id. at 284, 124 S.Ct. 2562 (quoting McKoy v. North Carolina, 494 U.S. 433, 440-41, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990)). That means the Eighth Amendment requires admission of evidence with “any tendency,” not some stronger tendency, “to mitigate the defendant’s culpability.” 494 U.S. at 286, 110 S.Ct. 1056. And here — -unlike Tennard’s low IQ — Gabrion’s decision to throw Rachel Timmerman overboard where he did, rather than 228 feet to the north, had no tendency to mitigate his culpability for that crime.
That Michigan lacks a death penalty is irrelevant to a reasoned moral response to Gabrion’s background, character, and crime. Evidence concerning that fact — or any corollary ones — is not mitigation evidence under the Eighth Amendment. Accord United States v. Higgs, 353 F.3d 281, 328 (4th Cir.2003) (federal defendant’s ineligibility for death penalty under Maryland law was not mitigating).
*524 2.
The same conclusion holds under the Federal Death Penalty Act. The Act lists seven types of mitigating factors, plus a catch-all, that the jury “shall consider” in determining whether to recommend a death sentence. See 18 U.S.C. § 3592(a). Five of the factors measure the defendant’s culpability, to wit: “impaired capaeity[,]” § 3592(a)(1); “unusual and substantial duress,” § 3592(a)(2); “the defendant’s participation was relatively minor,” § 3592(a)(3); “[t]he defendant committed the offense under severe mental or emotional disturbance^]” § 3592(a)(6); and “[t]he victim consented to the criminal conduct that resulted in the victim’s death[,]” § 3592(a)(7). Another factor asks whether “[ajnother defendant or defendants, equally culpable in the crime, will not be punished by death.” Id. § 3592(a)(4). This factor does not measure the defendant’s culpability itself, but instead considers — as a moral data point — whether that same level of culpability, for another participant in the same criminal event, was thought to warrant a sentence of death. Hence this factor likewise addresses whether the defendant’s culpability warrants death. Another factor concerns the defendant’s background: “The defendant did not have a significant prior history of other criminal conduct.” Id. § 3592(a)(5). The remaining factor is the catch-all: rather than describe a specific type of mitigation evidence, as the other factors do, this factor simply tracks the Supreme Court’s definition of mitigation evidence. See id. § 3592(a)(8) (requiring consideration of “[ojther factors in the defendant’s background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence”).
That Michigan lacks a death penalty does not fall within any of these statutory mitigation factors. See Johnson, 223 F.3d at 675 (§ 3592(a) includes “only factors specific to the defendant”). Gabrion again does not even dispute the point. But he does contend that the statute’s enumeration of mitigating factors is not exclusive. See § 3592(a) (stating that the term “mitigating factors ... includes]” the enumerated factors). That is true enough; the statute does not purport to catalogue every conceivable circumstance that might diminish a defendant’s culpability or otherwise mitigate against a sentence of death. But neither do we have any reason to think that the term “mitigating factors,” as used in the statute, encompasses facts having nothing to do with “a reasoned moral response to the defendant’s background, character, and crime.” Penry, 492 U.S. at 319, 109 S.Ct. 2934 (emphasis omitted). Every indication in the statute is to the contrary: all of the examples of mitigating evidence listed in § 3592(a) concern the defendant’s background, culpability, or crime. The same is true for all 16 examples of aggravating factors set forth in § 3592(c). That Michigan lacks a death penalty is different in kind from any factor recognized as relevant to sentencing under § 3592(a) or (c).
Whatever the precise contours of the term “mitigating factor” as used in § 3592(a), the murder’s location in Michigan falls beyond them. That one defendant commits a murder on federal land in Michigan is not a mitigating factor — any more than another defendant’s commission of a murder on federal land in Ohio (a death-penalty state) is an aggravating one. Gabrion’s statutory argument, like his constitutional one, is meritless.
3.
Gabrion also makes what is known as a “residual doubt” argument. An element of Gabrion’s offense in this case was *525 that he murdered Rachel Timmerman within a National Forest. See 18 U.S.C. § 1111(b). Whether Gabrion killed Tim-merman inside the Forest (as opposed to killing her outside the Forest and then moving her body inside) was an issue extensively litigated during the guilt phase of Gabrion’s trial. The jury eventually found beyond a reasonable doubt that Gabrion killed Timmerman inside the Forest. Ga-brion now says that, under the Eighth Amendment and the Federal Death Penalty Act, he was entitled to argue to the jury during the penalty phase of his trial that they should consider — as a putative mitigating factor — any “residual doubt” about a fact they had already found beyond a reasonable doubt, i.e., that he killed Tim-merman inside the Forest.
A plurality of the Supreme Court has said that it is “quite doubtful” that there exists any constitutional right to argue “residual doubt” as a mitigating factor. Oregon v. Guzek, 546 U.S. 517, 525, 126 S.Ct. 1226, 168 L.Ed.2d 1112 (2006) (internal quotation marks omitted). Two other justices have rejected the right’s existence altogether. See id. at 528-30, 126 S.Ct. 1226 (Scalia, J., concurring). We are likewise doubtful that a (by-definition) unreasonable doubt regarding an issue litigated during the guilt phase of the trial can be part of “a reasoned moral response to the defendant’s background, character, and crime.” Penry, 492 U.S. at 319, 109 S.Ct. 2934 (emphasis in original).
But we need not decide that issue here. Under the Federal Death Penalty Act, “[t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless ... where the Government establishes beyond a reasonable doubt that the error was harmless.” 18 U.S.C. § 3595(c)(2)(C). We can make such a determination here, because — unlike in Davis v. Coyle, 475 F.3d 761, 774-75 (6th Cir.2007) — the record contains evidence concerning the factor {i.e., the murder’s location) that Gabrion -says was improperly excluded from the sentencing phase of his trial.
On this record, the exclusion of Ga-brion’s residual-doubt argument was so palpably harmless as to render an opinion on the merits of the exclusion nearly advisory. The government’s case for aggravation was overwhelming: Gabrion killed Timmerman in an undisputedly horrific manner, killed her infant daughter, likely killed three other people who either witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path. And unlike most residual-doubt cases— where the doubt concerns whether the defendant actually committed the murder— here the supposed doubt concerns only a technical jurisdictional issue that, though significant legally, is much less so morally. The exclusion of Gabrion’s residual-doubt argument was harmless beyond a reasonable doubt.
B.
Gabrion next claims that the district court was biased in favor of pro-death penalty jurors during the process of selecting his jury (i.e., voir dire). During that process, the court interviewed 101 potential jurors (i.e., venirepersons). Those interviews generally followed the same template: the court first spoke to the potential juror, explaining that Gabrion was presumed innocent, that the government bore the burden of proving Gabrion’s guilt, and that, if the jury found that the government had not carried its burden, the case was over. Then the court would explain to the potential juror that, if the jury found Gabrion guilty beyond a reasonable doubt, the case would proceed to the sentencing phase, which for practical purposes would *526 be like a new trial. That Gabrion would have been found guilty of premeditated murder was not a sufficient basis for the jury to recommend a death sentence. Instead, the court would explain, the government bore the burden of proving beyond a reasonable doubt any aggravating factors that the government thought favored a death sentence. The court would further explain that Gabrion was entitled to prove, merely by a preponderance of the evidence, any mitigating factors he thought applicable. The jurors would then weigh the aggravating factors against the mitigating ones, and could recommend death only if they found unanimously that the aggravators outweighed the mitigators. At that point in the voir dire, the court would typically ask the venireperson whether she could follow those instructions. Then the prosecution and defense lawyers would each have a turn questioning the potential juror. The court frequently asked its own follow-up questions after the lawyers were done. Once all the questioning was done, the court might excuse the juror on its own initiative, or either side could move to excuse the juror for cause. If a lawyer so moved, the court would hear argument from each side and then sustain or overrule the objection to the juror, explaining the reason for its decision as it did so.
In total, the court excused 25 potential jurors on its own initiative, mostly for reasons of personal hardship. Neither party objected to any of those exclusions. Ga-brion challenged a total of 16 jurors for cause, of whom the court excused 11. The government challenged a total of 14 jurors for cause, of whom the court again excused 11. Eventually the venire pool was narrowed to 56 potential jurors. Each side was then permitted to strike 20 potential jurors peremptorily. Gabrion used all 20 of his strikes, removing the five venireper-sons he had unsuccessfully challenged for cause, plus 15 other jurors. The government struck 18 potential jurors, including the ones it had unsuccessfully challenged for cause. Neither party objected to any of the 12 jurors who actually sat on Ga-brioris jury.
But Gabrion says the process was unfair nonetheless. Specifically, he claims that the district court improperly excluded four generally anti-death penalty venirepersons (Abrahams, Donahey, Hemmeke, and Groves) whom the government challenged for cause. Gabrion also claims that the court’s jury-selection process was generally “lopsided” in favor of jurors who supported the death penalty. We consider these claims in turn.
1.
“It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.” Ross v. Oklahoma, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Gabrion cannot plausibly argue that this right was violated here, since, he did not object to a single one of the jurors who sat in his case. But Gabrion does say that a related right was violated, namely, his right to an impartial jury “drawn from a venire that has not been tilted in favor of capital punishment by selective prosecuto-rial challenges for cause.” Uttecht v. Brown, 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). Gabrion says his venire was tilted this way because of the district court’s exclusion of the fora* venire-persons recited above.
A capital defendant’s right to an impartial jury is “balance[d]” against the government’s “strong interest in having jurors who are' able to apply capital punishment within the framework [the] law prescribes.” Id. The Supreme Court strikes that balance with the following *527 standard: The court may exclude a juror for cause based upon his views on capital punishment if “the juror’s views[,]” either in favor of the death penalty or against, “would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 88 L.Ed.2d 841 (1985) (internal quotation marks omitted).
We review the district court’s application of that standard with considerable deference. “Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.” Uttecht, 551 U.S. at 9, 127 S.Ct. 2218. (In contrast, the transcript we review captures only the dire part of voir dire.) In many instances, the court’s decision whether to exclude a juror also depends on its assessment of the juror’s credibility, which lies “peculiarly within a trial judge’s province.” Witt, 469 U.S. at 428, 105 S.Ct. 844. We are also mindful of “the expertise developed by trial judges” with respect to the jury-selection process in general. United States v. Purkey, 428 F.3d 738, 750 (8th Cir.2005) (internal quotation marks omitted). Accordingly, in reviewing the district court’s decision whether to exclude a particular juror, “the question is not whether [we] might disagree with the trial court’s findings, but whether those findings are fairly supported by the record.” Witt, 469 U.S. at 434, 105 S.Ct. 844; see also Bowling v. Parker, 344 F.3d 487, 519 (6th Cir.2003) (same).
We begin with the exclusion of venireman Abrahams. After the district court explained to him the weighing process involved in the sentencing phase of the trial, and asked whether he could follow “the instructions of this Court” in that process, Abrahams replied that “I’m more unsure of if [sic] I could outweigh the sentence of life imprisonment over death or vice ver-sa.” The prosecutor then asked Abrahams whether his “moral values” would “intere-fere with your determination of what an appropriate sentence would be[.]” Abra-hams replied that “I believe that it’s a possibility,” adding that “it’s just on my mind and it could be something that sidetracks my judgment.” In response to questioning by Gabrion’s counsel, however, Abrahams said, “[a]t this point, yes, I do believe that I could” consider whether a death sentence would be appropriate.
The court explored the apparent contradiction between these answers, saying, “I’m sorry, I heard two different things. I want to see if I can get this straight.” The court then asked Abrahams a leading question in favor of finding him qualified:
Q: And could you then impose either sentence if you felt the government had prevailed beyond a reasonable doubt with aggravating circumstances?
But Abrahams’s answer cut in favor of exclusion:
A: It’s — I’m not sure. That’s what I’m trying to express, that I don’t know for sure that I could go through the whole trial and, for instance, them prove him guilty and then go through the second part of the trial for sentencing, that I could say life imprisonment or death. I honestly don’t know. That’s the point that I was trying to get across. Very unsure of what I could say yes or no to, either way.
The court then excused Abrahams for cause, reasoning:
[N]ormally I would say if he says I’ll consider both of them, that’s normally *528 all right. But if it’s preceded with I don’t know if I could do it and then I ask him, Could you, and he says, I don’t know, I think it’s grounds for excusal. It’s a close question, but I think it’s grounds for excusal because of his hesitancy and the honesty with which he’s approached it.
Thus, the court itself sought to rehabilitate Abrahams after he gave conflicting answers regarding his ability to follow the court’s instructions. But Abrahams resisted the rehabilitation. The court was within its discretion to exclude him.
Venireman Donahey likewise resisted efforts at his rehabilitation. Donahey stated on his jury questionnaire that “I think the death penalty is wrong[,]” but then told the court that he “would follow what the law would tell me to do on that.” In response to an open-ended question by the prosecutor, however, Donahey said: “And to take life because they took someone else’s life, you know, somewhere down inside me, it just doesn’t seem right[J” He added, in response to a leading • question from the prosecutor, that his views about the death penalty “might” interfere with his “ability to make a judgment as to sentencing[.]” Gabrion’s counsel then sought to rehabilitate Donahey with a long explanation of the sentencing process, after which came the following exchange:
Q: Now, given this, would you be able to consider all of these factors in making a determination of sentence, aggravating factors, mitigating factors, bring your own values, and consider the imposition of one of these two sentences?
A: I believe it would be very difficult. I would hope that I could, you know. But until I’m actually in that position, it’s very difficult to say.
Q: Well, we understand it’s difficult. We understand it’s—
A: Well, you want a yes or no question to something—
Q: No, no. Can you consider it is the question.
A: Yes, I could consider it.
Q: I have no farther questions at the moment.
The district court excused Donahey for cause, explaining:
Q: Well, he said he didn’t know [whether he could consider the death penalty], he didn’t know to one of the questions he asked, and I think he should be excused. Number one, he indicates he has a strong moral view against the death penalty; and number two, when asked, he equivocated on whether or not he could in fact consider it. He would try hard, but he was unable to say that he would be able to do it. So I think he needs to be — he should be excused for that reason in this matter.
Donahey’s exclusion presents a closer question than Abrahams’s did. The first reason cited by the court — that “he indicates he has a strong moral view against the death penalty” — is not a ground for exclusion. Witt, 469 U.S. at 424, 105 S.Ct. 844. But the court did not rely on that reason alone, finding that Donahey “equivocated” as to whether he could consider the death penalty. That finding is plainly correct. The court’s final reason — that Donahey “was unable to say that he would be able to” consider the death penalty — is at least nominally refuted by Donahey’s answer that he “could consider it.” But that answer came in response to a leading question, after Ga-brion’s counsel had pressed him on the point; and the answer came on the heels of another equivocation — that it “would be very difficult” to consider a death sentence. Donahey’s statements, viewed as a *529 whole, were ambiguous; and “when there is ambiguity in the prospective juror’s statements, the trial court, aided as it undoubtedly is by its assessment of the venireman’s demeanor, is entitled to resolve it in favor of the” government. Uttecht, 551 U.S. at 7, 127 S.Ct. 2218 (internal quotation marks and alterations omitted). The court was within its discretion to exclude Donahey.
Venireman Hemmeke expressed stronger opposition to the death penalty than Donahey did, cheeking a box on the juror questionnaire that said, “I could never, regardless of the facts and circumstances, return a verdict which imposed the death penalty.” But his answers as a whole were incoherent. The court began the questioning as follows:
Q: Okay. What did you mean by that [response on the questionnaire]?
A: I feel that if he is guilty, that it’s more punishing to have him stay in jail in a — cooped up in a little cell than what it would be to be put to death.
Q: Oh. You think, then, that it’s more cruel—
A: To keep them—
Q: —to sentence to life in prison than it is to take life?
A: Yes.
Q: That’s why you would have difficulty imposing death?
A: Yes.
The court then asked Hemmeke whether he could follow the court’s instructions “on aggravating and mitigating circumstances and weighing those circum-stanees[.]” Hemmeke responded:
A: I — hearing what they might say, I might change it. But I’m pretty set in the no death penalty.
Q: Wait a minute. No death penalty because that’s lenient and life in prison is worse, right?
A: Yeah, yeah.
In response to questioning by the prosecutor, however, Hemmeke said: “If the facts are there, everything fits together, and it was a very gruesome, ugly murder, then I would maybe do it, maybe go with the death sentence.” Hemmeke also said — in response to a leading question from defense counsel — that “yeah[,]” he could consider a death sentence.
The court struck Hemmeke for cause, saying “I’m terribly upset by this man’s fuzzy thinking in which he thinks somehow that life in prison is more egregious than death[.]” The court added that “I’m not satisfied that this gentleman’s thought process can hang together for purposes of making the decision it needs to”; that “[m]y reason for excusing him is really I don’t think he can follow instructions”; and that “I ultimately think that the defendant may be prejudiced by him.” We have no basis to second-guess any of these findings.
That leaves the exclusion of venireman Groves, who was the “water resources director” for a local employer. The prosecution had actually contacted Groves about Gabrion’s case well before voir dire, asking him about the meaning of the term “navigable waters” under Michigan law. Groves said during voir dire that he could set that contact aside if necessary, but that he also had “a co-worker whose wife apparently went to school with [Gabrion], and I’ve been told things about [Gabrion].” Groves described those things as “very unflattering[.]” When asked by the court whether he would “be able to set that aside in this case[,]” Groves answered, “I’d like to think I could.” Groves also said that “I think I would reserve the death penalty for an individual like Osama *530 bin Laden where we have someone that’s a mass murderer type.” When later asked by defense counsel whether he could follow the court’s instructions in a sentencing phase, Groves answered: “I suppose I could, yes.”
The court excluded Groves for three reasons: “The first is he was apparently contacted by the government ... and I think that just raises a specter here that I think is inappropriate.” Even more troubling for the court, however, was a second reason:
I think this is really potentially very damning of Mr. Gabrion, he apparently talks to somebody he works with whose wife apparently went to school with Mr. Gabrion and she fills his ear with things about Mr. Gabrion. And I say, can you disregard that? And he looks at me and he says, Yeah, I think I can. I’m not convinced he’s very sincere.
Third, the court said that “when very artfully led though a serious of questions, he says, yeah, I could consider” the death penalty, but that Groves “winc[ed] and bob[bed] and weave[d] a little bit” when he said that. Each of these reasons was sufficient for Groves’s exclusion.
2.
Gabrion is unclear about the constitutional basis for his claim that the district court’s jury-selection process was generally “lopsided” in favor of pro-death penalty jurors. He says in passing that this claim is based upon the Equal Protection and Due Process clauses, but does not develop that argument enough for us to consider it here. Nor is it clear from the caselaw that the Sixth Amendment supports a jury-selection claim that is not based on either the exclusion of a particular anti-death penalty juror or the inclusion (on the actual petit jury) of an “automatic death penalty” juror. See Morgan v. Illinois, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). But we will assume without deciding that Gabrion can show a violation of the Sixth Amendment if he simply demonstrates that his jury selection process favored pro-death penalty jurors generally.
The factual basis for Gabrion’s claim, such as it is, is twofold. First, he says that “the trial court attempted to rehabilitate potential defense cause excusáis [i.e pro-death penalty jurors], but did not take the same approach to potential government cause excusáis lie., anti-death penalty ones].” Gabrion Suppl. Br. at 14. The record belies that assertion. Take the example of venireperson Branch, who stated on his questionnaire that he was “really against the death penalty.” In response to another question — whether there was “anything about this case that would prevent” him from following his oath if selected as a juror — Branch responded, yes: “The death penalty.” But the district court did not leave matters there and excuse Branch for cause. Instead, the court explained the trial process to Branch at length and then asked whether, as a part of that process, Branch could consider the death penalty. Branch said that he could. But Branch then backtracked in response to the prosecutor’s questions, saying that he was “not certain” whether he could consider the death penalty. So the court rehabilitated him again:
Q: ... I want to make sure that you’re on the page here. The predicate here was if the facts warranted it, in other words, if the facts were such that would warrant that, could you? And I heard you say I might not. What did you mean by that?
A: It’s hard to say without me being a juror or in the circumstances where I have to decide. I might say it’s a possibility of a yes or a no.
*531 Q: Right. And that’s based — I want to make sure — that’s based upon the facts, not on what your philosophy is?
A: Religion or nothing, no, just the facts.
Q: Okay. Thank you, sir. Thank you.
The government then moved to excuse Branch for cause. The court refused, explaining: “this witness says it depends on the facts, and I think that’s sufficient. I’m troubled by the fact that he previously stated, No way. But he obviously has done some thinking about this, and I think he’s appropriate.”
Likewise, there were two other anti-death penalty veniremeh — Wing and Fix— who at first equivocated regarding their ability to consider the death penalty, but then gave rehabilitative answers to followup questions from the court. Indeed, Ga-brion’s counsel cited Fix’s “response to your [ie., the district court’s] question” in opposing the government’s motion to excuse Fix for cause. The court “agree[d]” with Gabrion’s counsel on that point, and overruled the government’s objections to both Fix and Wing. Moreover, as noted above, the court asked venireman Abra-hams a leading question in favor of rehabilitation, but Abrahams declined to follow the court’s lead. Thus, Gabrion’s assertion that the court rehabilitated only pro-death penalty venirepersons is simply false.
Gabrion also says the district court was biased because it excluded four generally anti-death penalty venirepersons (Abra-hams, Donahey, Hemmeke, and Groves, already discussed above) while retaining three generally pro-death penalty ones (Harrington, Wehler, and Erickson) whom Gabrion challenged for cause (and later struck peremptorily). It is true, of course, that the court excluded the one set of venirepersons while retaining the other. But the argument’s premise is wrong. Jurors are not commodities. They are individuals, whose answers during voir dire differ in various ways, some subtle and some not. Here, the district court took account of those differences and excluded Abrahams, Donahey, Hemmeke, and Groves for the reasons already mentioned. And it retained pro-death penalty jurors Harrington, Wehler, and Erickson on grounds similar to the grounds on which it retained anti-death penalty jurors Branch, Fix, and Wing — namely, that on balance each of them credibly stated that he could follow the court’s instructions in choosing a sentence in the case. See, e.g., 2 Jury Trial Tr. at 335 (stating that Branch “is, in my opinion, a flip of the Wehler guy”); Id. at. 536 (stating that Harrington “is not unlike this morning’s Mr. [ ] Branch who said he could never impose the death penalty ... and come to find out, he said he could be fair”).
The district court did a commendable job, not an unconstitutional one, of selecting a jury in this case. Gabrion’s arguments to the contrary are meritless.
C.
Gabrion next argues that the district court gave the jury erroneous instructions with regard to the findings necessary to its recommendation that the court sentence Gabrion to death. In order for Ga-brion to be eligible for the death penalty, the jury had to find two things beyond a reasonable doubt: first, that Gabrion killed Rachel Timmerman “intentionally[,]” 18 U.S.C. § 3591(a)(2)(A); and second, that the government proved “at least one of the statutory aggravating factors set forth at § 3592.” Jones v. United States, 527 U.S. 373, 376-77, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). “Once [Gabrion] became death eligible, the jury had to decide whether he should receive a death sentence.” Id. at *532 377, 119 S.Ct. 2090. Specifically, the jury was required to
consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death.... Based upon this consideration, the jury by unanimous vote ... shall recommend whether the defendant should be sentenced to death[.]
18 U.S.C. § 3593(e). If the jury recommends death, the district court is required to impose that sentence. See 18 U.S.C. § 3591(a)(2).
Here, the jury found beyond a reasonable doubt that Gabrion killed Timmerman intentionally and that two statutory aggravating factors were present. The jury also determined, unanimously, that the government’s aggravating factors sufficiently outweighed the mitigating ones to justify a sentence of death. But Gabrion argues that the jury was required to make the latter determination-ie., the “outweighs” one-beyond a reasonable doubt. The district court did not instruct the jury to that effect, so Gabrion says we must vacate his sentence.
As support for his argument, Gabrion cites the Supreme Court’s holding in Apprendi v. New Jersey, 530 U.S. 466, 489, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). There, the Court held that, “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” Id. at 490, 120 S.Ct. 2348. Gabrion says that the jury’s “outweighs” determination is a “fact” that increases his maximum sentence from life to death, and thus must be proved beyond a reasonable doubt.
The problem with this argument is that Apprendi does not apply to every “determination” that increases a defendant’s maximum sentence. Instead it applies only to findings of “fact” that have that effect. Id. In Apprendi itself, for example, the Court held that a jury was required to find beyond a reasonable doubt that the “defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of raee[.]” Id. at 468-69, 120 S.Ct. 2348. In Blakely v. Washington, 542 U.S. 296, 300, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the same was trae about a finding that the defendant acted with “deliberate cruelty[.]” In United States v. Booker, 543 U.S. 220, 233, 235, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the same was true about a finding that the defendant possessed more than 500 grams of crack. Even in United States v. Gaudin, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)-a case often cited as the high-water mark for what counts as a “fact” for purposes of Apprendi&emdash;the necessary finding was simply that the defendant’s statement was likely to have a particular effect on its recipient.
These sorts of findings&emdash;that a particular statement might influence its recipient, or that the defendant acted with a particular state of mind, or possessed a particular quantity of drugs, or was himself the trig-german, rather than just an accomplice&emdash; are different in kind from the “outweighs” determination required by § 3593(e). Ap-prendi findings are binary&emdash;whether a particular fact existed or not. Section 3593(e), in contrast, requires the jury to “consider” whether one type of “factor” “sufficiently outweigh[s]” another so as to “justify” a particular sentence. Those terms&emdash;consider, justify, outweigh&emdash;reflect a process of assigning weights to competing interests, and then determining, based upon some criterion, which of those interests predominates. The result is one of *533 judgment, of shades of gray; like saying that Beethoven was a better composer than Brahms. Here, the judgment is moral — for the root of “justify” is “just.” What § 3593(e) requires, therefore, is not a finding of fact, but a moral judgment.
In that respect § 3593(e) is no different from 18 U.S.C. § 3553, which likewise requires the decisionmaker to “consider” various “factors” and then determine — as a prerequisite to imposing a particular sentence — that the sentence is “sufficient, but not greater than necessary” to comply with the purposes set forth in § 3553(a)(2). That determination is just as necessary to the selection of a sentence under § 3553(a) as the “outweighs” determination is to the selection of a sentence under § 3593(e). The two determinations are therefore indistinguishable for purposes of Apprendi; and yet no one contends that a jury must find beyond a reasonable doubt that a particular sentence is “sufficient, but not greater than necessary” under § 3553(a)(2).
What § 3593(e) requires, in summary, is not a finding of fact in support of a particular sentence. What § 3593(e) requires is a determination of the sentence itself, within a range for which the defendant is already eligible. That makes this case different from any in which the Supreme Court has applied Apprendi. Here, Ga-brion was already “death eligible” once the jury found beyond a reasonable doubt that he intentionally killed Rachel Timmerman and that two statutory aggravating factors were present. Jones, 527 U.S. at 377, 119 S.Ct. 2090. At that point the jury did not need to find any additional facts in order to recommend that Gabrion be sentenced to death. It only needed to decide, pursuant to the weighing of factors described in the statute, that such a sentence was “just[ ].” 18 U.S.C. §§ 3591(a), 3593(e). And in making that moral judgment, the jury did not need to be instructed as if it were making a finding of fact.
Every circuit to have addressed the argument that Gabrion makes here — six circuits so far — has rejected it. See United States v. Runyon, 707 F.3d 475, 516 (4th Cir.2013); United States v. Fields, 516 F.3d 923, 950 (10th Cir.2008); United States v. Mitchell, 502 F.3d 931, 993-94 (9th Cir.2007); United States v. Sampson, 486 F.3d 13, 31 (1st Cir.2007); United States v. Fields, 483 F.3d 313, 345-46 (5th Cir.2007); Purkey, 428 F.3d at 749. Today we become the seventh. Gabrion’s argument is meritless.
III.
A.
Gabrion also presents three arguments that he says the original panel in his appeal overlooked.
1.
Gabrion’s first such argument is that we should order a determination of his competency for purposes of his appeal. By way of background, the district court appointed no fewer than three mental-health experts to examine Gabrion, each of whom concluded that he was both competent and malingering. (To malinger is to manipulate; and persons with Histrionic or Antisocial personalities tend to be highly manipulative. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 713 (4th ed. 2000); see also id. at 702 (Antisocials “may repeatedly lie, use an alias, con others, or malinger”).) We agree with the original panel that the district court was correct to find that Gabrion was competent to stand trial. See 648 F.3d at 318-20. And Gabrion’s argument that we should order a new determination of his competency for purposes of his ap *534 peal is, in substance, simply a rehash of his argument that he was incompetent in the district court. Overlooked or not, this argument is meritless.
2.
Gabrion says the original panel also overlooked his argument that the district court should not have excluded him from the courtroom during a portion of the trial’s penalty phase. The exclusion in question occurred after Gabrion punched his lawyer in the face in the presence of the jury. The district court sent Gabrion upstairs to the courthouse lockup, where for the remainder of that afternoon he watched the trial on closed-circuit television. The next morning the U.S. Marshal reported that Gabrion had been “very unruly in the cell block throughout the afternoon, banging on the cell, yelling, that sort of behavior all afternoon[.]” Gabrion’s counsel reported the same thing. The court left Gabrion upstairs for a total of 24 witnesses.
The Confrontation Clause and Federal Rule of Criminal Procedure 43 ordinarily require a district court to warn a. disruptive defendant before removing him from the courtroom. See Gray v. Moore, 520 F.3d 616, 624 (6th Cir.2008); Fed.R.Crim.P. 43(c)(1)(C). Here, Gabrion got plenty of warning. For example, Ga-brion repeatedly interrupted the court during a hearing three days before trial. The court warned him: “Mr. Gabrion, I will remove you and I will penalize you if you continue to interrupt me or anyone else during this trial very specifically. I mean that. Do you understand that?” The court later added, “I’m giving you fair warning and I want you to hear me very clearly. I will not tolerate interruptions or noise during the trial.” So lack of warning is not an issue here.
Gabrion contends, however, that the court should have returned Gabrion to the courtroom sooner than the court actually did. Specifically, Gabrion suggests that the court should have put him in shackles and returned him to the courtroom almost immediately after the punch, albeit with a stern warning, apparently, that additional outbursts would lead to his removal. The argument defies common sense. Setting aside the whole question whether Gabrion could have been physically restrained, the court had every reason to think that Ga-brion would continue to be verbally disruptive if he were promptly to return. And Gabrion admits that a district court can exclude a defendant who is verbally disruptive. See Gabrion Pet’n for Reh’g at 3.
Gabrion was verbally disruptive throughout almost the entire trial. To cite one of dozens of examples, during the prosecution’s opening statement during the penalty phase, Gabrion interjected for all to hear: “Why do you just let him stand up there and lie like that and never do anything about it? It’s bullshit.... Fucking liar asshole.” The court had no reason to think Gabrion would behave any better just after punching his counsel and carrying on upstairs all afternoon. The district court did not abuse its discretion by excluding Gabrion for the period it did. See Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (“trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case”).
3.
Finally, Gabrion says the original panel overlooked his argument that Dr. Saa-thoffs testimony in rebuttal violated Ga-brion’s Fifth and Sixth Amendment rights to the extent that Dr. Saathoff testified about Gabrion’s contempt for women. We *535 do not think the panel overlooked this argument. Gabrion concedes that Dr. Saathoff could testify about subjects raised by Gabrion’s experts in mitigation. See Gabrion 2009 Suppl. Br. at 38-39. But Gabrion asserts that Dr. Saathoffs testimony about Gabrion’s misogyny exceeded the scope of his experts’ testimony in mitigation, thereby allegedly violating Ga-brion’s rights under the Fifth and Sixth Amendments.
The original panel correctly determined that the factual premise of this argument is incorrect: “Dr. Saathoffs testimony as a whole was a fair rebuttal of Gabrion’s mitigation evidence and did not unfairly prejudice Gabrion.” 648 F.3d at 341. For example, Dr. Jackson — one of Gabrion’s experts — testified at length about “Ga-brion’s psychological makeup[,]” an open-ended subject of which Gabrion’s misogyny was certainly a part. Gabrion’s mitigation evidence also downplayed the extent of his future dangerousness to women. See Id. Thus, whatever the contours of the Fifth and Sixth Amendment rights that Gabrion asserts here, Dr. Saathoffs testimony did not violate them — for reasons already stated in the original panel opinion.
B.
Gabrion also presents more than a dozen other arguments that the original panel unanimously rejected. See, e.g., Gabrion Br. at 78 (the district court abused its discretion “by removing a juror who was allegedly sleeping”). We have reviewed those arguments, but do not think it worthwhile to address them again here. It is enough for our purposes to state that we reject all of Gabrion’s remaining arguments.
* *
After 11 days of testimony and two days of careful deliberation, the 12 jurors who sat on this case decided unanimously that Marvin Gabrion deserved a sentence of death for what he did to Rachel Timmer-man. We have no basis to set aside that moral judgment. The district court’s judgment is affirmed.