# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D23-3201
Lower Tribunal No. 20-CF-8754-A

_____

STATE OF FLORIDA,

Petitioner,

v.

ANGEL ALEJANDRO LOBATO,

Respondent.

_____

Petition for Writ of Certiorari to the Circuit Court for Polk County.
J. Kevin Abdoney, Judge.

May 31, 2024

NARDELLA, J.

The State of Florida petitions this Court for a writ of certiorari.[1] It seeks to quash the trial court's nonfinal order denying its request to apply recently enacted statutory death penalty sentencing procedures of section 921.141 of the Florida Statutes during any penalty phase of Respondent Angel Lobato's upcoming trial. § 921.141, Fla. Stat. (2023). For the reasons that follow, we grant the petition for writ of certiorari and quash the trial court's order.

I.

---

[1] The State sought relief in the alternative; we proceed under certiorari jurisdiction.

In 2020, the State of Florida indicted Respondent for the first-degree murder of Danny Frazier. Due to the nature of the crime, the State sought the death penalty under an older version of section 921.141 and disclosed five statutory aggravating factors for a jury to determine during any penalty proceeding following a conviction.

Before Respondent's trial commenced, Florida adopted a new law governing death penalty proceedings. Ch. 2023-23, Laws of Fla. The new law leaves untouched the overall framework for any death penalty proceeding, which continues to consist of three phases.

The first phase remains entirely unchanged. Before a jury determines whether it will recommend a death sentence, the jury must unanimously convict a defendant of a capital felony. Once convicted, in the second phase, a jury must unanimously determine the defendant is eligible for the death penalty based on at least one aggravating factor proven beyond a reasonable doubt. This portion of the second phase also remains unchanged. *Compare* § 921.141(2)(a), (b), Fla. Stat. (2020), *with* § 921.141(2)(a), (b), Fla. Stat. (2023).

If a jury unanimously determines an aggravating factor exists, then it must deliberate and make a "recommendation to the court as to whether the defendant shall be sentenced to life imprisonment without the possibility of parole or to death." § 921.141(2)(b)2., Fla. Stat. (2020); § 921.141(2)(b)2., Fla. Stat. (2023). While the nature of the "recommendation to the court" stays the same, the number of jurors necessary to make the recommendation decreased from unanimous to a

supermajority—from twelve to eight. *Compare* § 921.141(2)(c), Fla. Stat. (2020), *with* § 921.141(2)(c), Fla. Stat. (2023).

The final phase concerns the role of the judge and has been revised to require an additional task from the sentencing judge following a *Spencer*[2] hearing. The new law requires the sentencing judge to prepare a written order for either a death sentence or a life sentence, which must include "the reasons for not accepting the jury's recommended sentence, if applicable." § 921.141(4), Fla. Stat. (2023). Before the new law, a trial court could impose a life sentence without an explanatory order. § 921.141(4), Fla. Stat. (2020).

After the revised statute became law, the State filed a motion to apply the updated death penalty sentencing procedures, rather than those in place at the time of the murder, to any potential penalty proceeding after Respondent's trial. The State argued the two revisions to section 921.141 should apply during any penalty proceeding because they are procedural in nature. In opposition, the Respondent argued applying the new procedures to the present case offended ex post facto

---

[2] *See Spencer v. State*, 615 So. 2d 688 (Fla. 1993). The purpose of a *Spencer* hearing is to:

> (a) give the defendant, his counsel, and the State, an opportunity to be heard; (b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; (c) allow both sides to comment on or rebut information in any presentence or medical report; and (d) afford the defendant an opportunity to be heard in person.

*Id*. at 691.

principles.  After undertaking a thorough review of the relevant case law, the trial court agreed with Respondent and denied the State's motion in a detailed and thoughtful order.  This petition seeking extraordinary writ relief followed.

## II.

To be entitled to certiorari relief the State must establish three elements: (1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the case, (3) that cannot be corrected on a plenary, direct appeal. *Univ. of Fla. Bd. of Trs*. *v. Carmody*, 372 So. 3d 246, 252 (Fla. 2023).  The second and third prong, termed irreparable harm, are jurisdictional requirements considered in tandem.  *See Citizens Prop. Ins. Corp. v. San Perdido Ass'n*, 104 So. 3d 344, 351 (Fla. 2012) (explaining the threshold inquiry is whether there exists "a material injury that cannot be corrected on appeal, otherwise termed as irreparable harm").  As an "extraordinary remedy," this court can only consider the merits of the petition for certiorari relief if the jurisdictional threshold is met.  *Carmody*, 372 So. 3d at 251–52.

Recently, in *State v. Victorino*, the Fifth District Court of Appeal confronted the question of irreparable harm while addressing a similar petition seeking to apply the amended version of section 921.141 to a resentencing proceeding in the trial court.  In its opinion, our sister court found the State satisfied the jurisdictional threshold for certiorari review because, "[i]f applying the old statute was indeed error, the irreparable harm to the State was obvious because apart from certiorari relief, the State would have no way to recover from the error."  *State v. Victorino*,

372 So. 3d 772, 777 (Fla. 5th DCA 2023); *see also Wright v. State*, 586 So. 2d 1024, 1032 (Fla. 1991) ("In the context of capital proceedings, the constitutional protection against double jeopardy provides that if a defendant has been in effect 'acquitted' of the death sentence, the defendant may not again be subjected to the death penalty for that offense if retried or resentenced for any reason."); *State v. Pettis*, 520 So. 2d 250, 253 n.2 (Fla. 1988) ("The defendant does not suffer the same prejudice [as the State does from erroneous pre-trial rulings] because he always has the right of appeal from a conviction in which he can attack any erroneous interlocutory orders."). We agree with the irreparable harm analysis in *Victorino* and find we also have jurisdiction to address the merits of the State's current petition.

III.

A.

The issue remaining then is whether the trial court departed from the essential requirements of law by denying the State's motion to apply the revised version of section 921.141 during the potential penalty phase of Respondent's trial rather than the version in effect at the time the alleged murder occurred. The ultimate answer to the remaining issue lies not in the enacting language of the statute, which expressly provides for its immediate application,[3] but, as Respondent argues, in the

---

[3] Chapter 2023-23, Laws of Florida expressly states, "This Act shall take effect upon becoming a law." S*ee also Parker v. Evening News Pub. Co*., 44 So. 718, 718 (Fla. 1907) (holding act became effective upon approval by the executive when it stated it "shall take effect immediately on becoming a law.").

5

contours of the constitutional prohibition of ex post facto laws, which we now examine.

Article I of the United States Constitution states neither Congress nor any State shall pass any "ex post facto Law." Art. I, § 9, cl. 3, § 10, cl. 1, U.S. Const. The Florida Constitution contains a similar limitation. Art. I, § 10, Fla. Const. In general, the ex post facto clauses in both Constitutions prohibit the State of Florida from retroactively changing the definition of a crime to make formerly innocent behavior illegal or increasing the punishment for criminal acts. *See Collins v. Youngblood*, 497 U.S. 37, 42–43 (1990). The latter, retroactively increasing the punishment for criminal acts, is the issue before us. Almost fifty years ago, it was also the subject of a United States Supreme Court opinion determining whether an earlier change to Florida's death penalty sentencing procedures violated the constitutional prohibition against ex post facto laws. *See Dobbert v. Florida*, 432 U.S. 282 (1977). The State urges us to apply the same analysis and reach the same conclusion as the *Dobbert* Court did nearly five decades ago.

In that case, Dobbert was accused of murdering his children. Under the law in effect at the time of the murder, Florida required imposition of the death penalty for Dobbert's crime unless the jury recommended mercy, a recommendation binding on the trial judge. *Id*. at 287–88. After Dobbert committed his crimes, but before trial, the law changed. *Id*. The Florida Legislature overhauled the state's death penalty process in response to the United States Supreme Court's striking down another state's death penalty statute. *Id*. at 288. The new statute provided that

following a capital felony conviction, the trial court must hold a separate "sentencing hearing" to consider aggravating and mitigating evidence after which the jury recommends a sentence to the judge. *Id*. at 290. Unlike the prior procedure, the judge was not bound by the jury recommendation. *Id.* at 290–92. Dobbert was tried under the new statute. The jury recommended a life sentence, but the trial court— under its new authority—overruled the jury and sentenced Dobbert to death. *Id.* at 287.

Dobbert challenged his sentence before the United States Supreme Court, arguing the application of Florida's new death penalty procedures violated the constitutional prohibition against ex post facto laws. *Id.* at 287. He argued the Florida law in effect when he committed his crimes made the jury's recommendation of life binding on the trial judge, and the change in the roles of judge and jury resulted in a greater sentence than he would have otherwise received. *Id.* at 292. He argued he was thus entitled to proceed under the prior law. *Id.*

The United States Supreme Court rejected this argument and explained that changes which are procedural in nature and effect, even those that may work to the disadvantage of a defendant, are not ex post facto. *Id.* at 293. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed and did not affect matters of substance. *Id.* at 293–94. To affect matters of substance, the procedural change must increase the quantum of punishment attached to the already completed crime. *Id.*

Applying the same analysis in this case, would, as the State argues, lead to the same conclusion. The revised statute alters two modes of procedure during different portions of a multi-phase death penalty proceeding. As in *Dobbert*, the quantum of punishment attached to the crime remains the same. Addressing the amendment to section 921.141, the Fifth District recently explained, and we agree, it is "quintessentially procedural" in nature and has no substantive effect. *Victorino*, 372 So. 3d at 778.

## B.

Urging us to disregard *Dobbert*, Respondent attacks its test as a rigid "substance versus procedure litmus test." We reject this narrow reading of *Dobbert*. The *Dobbert* Court did not, as Respondent's characterization suggests, restrict its analysis to examining only the nature of the change. It also measured the effect. It did so by asking whether the change affected "matters of substance," which it answered in the negative because the change neither (1) made criminal a theretofore innocent act, (2) aggravated a crime previously committed, (3) provided greater punishment, nor (4) changed the proof necessary to convict. *Dobbert,* 432 U.S. at 293–94; *see also Collins*, 497 U.S. at 45 (explaining that a procedural change may constitute an ex post facto violation only if it "affect[s] matters of substance").

The matters of substance listed and analyzed by the *Dobbert* Court originate from one of our country's oldest precedents, *Calder v. Bull*, 3 U.S. 386 (1798), which

8

set forth the same four categories[4] and reiterated the rule which applies today—if a challenged law retroactively affects one of the four categories, it violates the constitutional prohibition on ex post facto laws. Since *Calder*, the United States Supreme Court has continued to remind us that all ex post facto claims must be evaluated for retroactive effects considering the four categories outlined in *Calder*. *See, e.g.*, *Carmell v. Texas*, 529 U.S. 513, 539 (2000).

Doing so here, as was done by the *Dobbert* Court, we find the two procedural changes to the multi-phase penalty process do not affect matters of substance as set forth in *Calder* and as analyzed in *Dobbert*, because neither procedural change (1) made criminal a theretofore innocent act, (2) aggravated a crime previously committed, (3) provided greater punishment, nor (4) changed the proof necessary to convict. *See Shenfeld v. State*, 44 So. 3d 96, 100–101 (Fla. 2010) (explaining that such matters of substance are implicated only when the law falls within one of the

---

[4] In *Calder*, those categories were described as follows:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2nd. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed. 3rd. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender*.

3 U.S. at 390 (emphasis added).

9

four *Calder* categories).  Rather, the two changes at issue here are procedural in both nature *and* effect and, therefore, under *Dobbert*, should apply during any penalty phase of Respondent's upcoming trial.

C.

Although we find *Dobbert* dispositive, it is not the only United States Supreme Court authority which compels our decision.  Even if we were to accept Respondent's argument that *Dobbert* set forth a rigid substance versus procedural litmus test which is no longer in use, Respondent's ex post facto claim would still fail under *Collins*, a seminal case which has primacy of place in this country's ex post facto jurisprudence for re-establishing the exclusivity of *Calder*'s four categories.

In *Collins,* the United States Supreme Court was asked to consider whether a law that allowed reformation of an improper jury verdict without the necessity of remand for retrial offended the prohibition against ex post facto laws.  497 U.S. at 39–40.  Relying on an earlier opinion, *Thompson v. Utah*, 170 U.S. 343 (1898), the Court of Appeals had answered the question in the affirmative. *Youngblood v. Lynaugh*, 882 F.2d 956, 959 (5th Cir. 1989), *rev'd sub nom. Collins*, 497 U.S. 37. On petition for certiorari, however, the United States Supreme Court reversed and overruled its prior precedent relied upon by the Court of Appeals.  *Collins*, 497 U.S. at 47–48.  And that is important because in overruling *Thompson*, the *Collins* Court addressed an ex post facto claim that is strikingly similar to the question we confront here, i.e., whether reducing the number of jurors required to recommend a death

sentence from unanimous to a supermajority—from twelve to eight—violates the constitutional prohibition against ex post facto laws. *Id*. at 51–52.

Thompson committed a capital crime when applicable law guaranteed him a jury of twelve. *Thompson*, 170 U.S. at 344. By the time his trial took place, however, a change in the law afforded Thompson only a jury of eight. *Id.* at 344–45. Meaning, that by the time Thompson was tried, the State of Utah had to convince four fewer jurors of Thompson's guilt. Sympathetic to Thompson's ex post facto challenge, the United States Supreme Court held that reducing a trial jury from twelve jurors to eight deprived Thompson of "a substantial right involved in his liberty," "materially alter[ed] the situation to his disadvantage," and thus violated the ex post facto clause. *Id.* at 352–53.

Importantly, the *Thompson* Court did not find that the reduction in the number of jurors affected matters of substance as set forth in *Calder*, even though the State needed four fewer votes to secure a conviction under the new law. As a result, the *Thompson* decision could not stand. Writing for the majority in *Collins*, Justice Rehnquist delivered the blow, explaining the Court's decision to overrule *Thompson*: while "[t]he right to jury trial provided by the Sixth Amendment is obviously a 'substantial' one . . . it is not a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern of the *Ex Post Facto* Clause." *Collins*, 497 U.S. at 51.

The analytical framework applied in *Collins* to overturn *Thompson* dooms Respondent's substantially similar claim for falling outside *Calder*'s four categories.

If reducing the number of jurors needed to unanimously convict a defendant does not implicate one of *Calder*'s four categories, then surely reducing the number of votes needed to provide a "recommendation" of death also fails.

D.

Finally, we write to address Respondent's argument that *Peugh v. United States*, 569 U.S. 530 (2013), a more recent decision of the United States Supreme Court addressing federal sentencing guidelines, should guide our analysis.[5] *Peugh* also concerns *Calder's* third category of ex post facto laws, those that "chang[e] the punishment, and inflic[t] a greater punishment, than the law annexed to the crime, when committed." *Id.* at 530–31. But, unlike *Dobbert* and *Collins*, *Peugh's* test applies to a different category of cases which examine ex post facto claims related to federal sentencing guidelines and parole. *See Holmes v. Christie*, 14 F.4th 250 (3d Cir. 2021) (vacating and remanding the dismissal of the defendant's ex post facto claim for the lower court to determine whether the retroactive application of an amendment to the rules governing parole created a significant risk of prolonging the defendant's incarceration); *Cross v. United States*, 892 F.3d 288, 305 (7th Cir. 2018) (determining that lengthening advisory guidelines increased the likelihood of

---

[5] Respondent argues *Dobbert* is outdated and should be ignored by this court in favor of *Peugh*. But *Dobbert* is still being cited as authority and analyzed for guidance by appellate courts across the country. For example, in *McGill v. Shinn*, a decision out of the Ninth Circuit Court of Appeals three years ago, procedural changes to the death penalty process in Arizona were upheld on the basis of *Dobbert*. *See* 16 F.4th 666 (9th Cir. 2021); *see also Smith v. Ryan*, 823 F.3d 1270, 1285 (9th Cir. 2016).

prolonged sentences which raised ex post facto concerns); *Bates v. United States*, 649 F. App'x 971, 975 (11th Cir. 2016) (finding trial counsel's performance was deficient for failing to object when the trial judge sentenced the defendant under the sentencing guidelines in effect at sentencing as opposed to when the offenses were committed resulting in a substantial risk of a harsher sentence in violation of the ex post facto clause); *United States v. Ortiz*, 621 F.3d 82, 87 (2d Cir. 2010) (recognizing the ex post facto clause protects against a post-offense sentencing guidelines change that creates a significant risk of increasing a defendant's punishment); *United States v. Lewis*, 606 F.3d 193, 199 (4th Cir. 2010) (holding that an increased advisory sentencing guidelines range posed a significant risk that a defendant would be subject to an increased punishment in contravention of the ex post facto clause). We think those cases differ in kind and reject Respondent's argument that *Peugh's* test is applicable here.

Nevertheless, even if we were to accept Respondent's theory that *Peugh* set forth a test of general applicability, Respondent would still fail a *Peugh* inquiry. In analyzing the third category in *Calder*, the *Peugh* Court utilized a risk analysis, explaining the touchstone of a proper inquiry is whether the retroactive application of the change in the law created a "'sufficient risk of increasing the measure of

punishment attached to the covered crimes[,]'" a question never asked in *Dobbert*. *Peugh*, 569 U.S. at 539 (quoting *Garner v. Jones*, 529 U.S. 244, 250 (2000)).[6]

In *Peugh*, the "sufficient risk" test was implicated where the State sentenced a defendant under guidelines promulgated after he committed his criminal act and the sentencing range in the new version was significantly harsher than the version in place at the time of the offense. *Id.* at 539 (citing *Calder*, 3 U.S. at 390). This, the *Peugh* Court found, presented a sufficient risk of increasing the measure of punishment attached to the covered crimes. *Id.* at 550. Applying that rule in this case, however, does not lead to the same result.

In finding a sufficient risk, the *Peugh* Court began by explaining the important role the guidelines play in the federal sentencing scheme and the obstacles to deviating from those guidelines. *Id.* at 536–37, 539–40. It emphasized that the guidelines in practice usually control the sentence. In such a circumstance, a detrimental change in the guidelines virtually guarantees an increase in the measure of punishment the defendant will face. Such is not the case here.

The Legislature's changes to two parts of Florida's multi-phase death sentence procedure, which apply only after a unanimous jury conviction of a defendant for a qualifying crime, as well as a unanimous finding of an aggravating factor beyond a reasonable doubt, do not rise to the requisite degree of risk necessary

---

[6] Other places in the *Peugh* opinion refer to the test as the "significant risk" test. *Id.* at 550. *See also Beckles v. United States*, 580 U.S. 256, 267 (2017) (quoting a portion of *Peugh* which describes the test in terms of "significant risk"). The Court appears to treat the terms "significant risk" and "sufficient risk" interchangeably.

14

to offend *Calder*'s third category, even under a *Peugh* analysis. As the *Peugh* Court made clear, the question of "when a change in law creates such a risk is 'a matter of degree'; the test cannot be reduced to a 'single formula.'" *Peugh,* 569 U.S. at 539 (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995)). Simply put, here the requisite degree of risk is not present where the essential framework remains entirely intact and a supermajority is still required to offer a recommended sentence in the second of a three-phase penalty proceeding.

The trial court's obligation to memorialize its findings supporting a life sentence following the final phase of this proceeding similarly fail to implicate the risk at issue in *Peugh*.

Moreover, the sufficient risk rule utilized in *Peugh* fails for another reason in this case. *Calder*'s third category of ex post facto laws concerns those that "chang[e] the punishment, and inflic[t] a greater punishment, than the law annexed to the crime, when committed." *Peugh*, 569 U.S. at 530–31. The two procedural changes in the revised statute here do not address the punishment stage of a death penalty proceeding, but rather concern the question of mercy, which works only to abrogate, not to augment the punishment which can be imposed.

Section 921.141(2), Florida Statutes (2023), which is titled "Findings and recommended sentence by the jury," requires two findings by a jury after a defendant is unanimously convicted of a capital crime. The first is an eligibility finding, which requires a unanimous jury to find a statutory aggravating factor beyond a reasonable doubt that exposes the defendant to a death sentence. *State v. Poole*, 297 So. 3d 487,

503 (Fla. 2020). It is the eligibility finding which, in a real way, affixes the punishment a defendant may face. That eligibility finding remains unchanged in the 2023 statute. *Compare* § 921.141(2)(b)2., Fla. Stat. (2020), *with* § 921.141(2)(b)2., Fla. Stat. (2023).

The second finding concerns selection—whether the jury will recommend a death sentence. The United States Supreme Court has found the selection finding involves determining "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa v. Cal.*, 512 U.S. 967, 972 (1994). It is this selection finding that is the subject of the first procedural change at issue in the current version of the statute. The selection finding in section 921.141(3) is not a "fact" but a "moral judgment." *Poole*, 297 So. 3d at 503 (quoting *United States v. Gabrion*, 719 F.3d 511, 533 (6th. Cir. 2013)). Whether mitigating factors outweigh aggravating factors "is mostly a question of mercy[.]" *Id.* (citing *Kan. v. Carr*, 507 U.S. 108, 119 (2016)). If a jury recommends no mercy, the measure of punishment is unchanged, and the trial court still makes the ultimate decision. If a jury recommends mercy, the measure of punishment is decreased, and the trial court cannot sentence the defendant to death. Such a change to the process, whereby a recommendation of mercy is extended or denied, does not inflict a greater punishment than the law annexed to the crime when committed. And, neither does a requirement that a trial court memorialize its justification for granting mercy in writing create an ex post facto violation.

16

Therefore, even if we were to apply the "sufficient risk" rule utilized in *Peugh*, we would still find the trial court departed from clearly established law in determining that two procedural changes to the final selection portion of the penalty proceeding violated the constitutional prohibition against ex post facto laws. Accordingly, based upon clearly established law, we quash the trial court's order.

PETITION FOR CERTIORARI GRANTED; ORDER QUASHED.

STARGEL, J., concurs.
WHITE, J., dissents, with opinion.

_____

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED

_____

WHITE, J., dissenting.

"A writ of certiorari to correct a nonfinal order is indeed 'an extraordinary remedy.'" *State v. Garcia*, 350 So. 3d 322, 325 (Fla. 2022) (quoting *Martin-Johnson, Inc. v. Savage*, 509 So. 2d 1097, 1098 (Fla. 1987)). Because the State fails to meet the rigorous requirements for this extraordinary writ, I dissent.

I.

To obtain certiorari relief, the State must establish "(1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the case (3) that cannot be corrected on postjudgment appeal." *Williams v. Oken*, 62 So. 3d 1129, 1132 (Fla. 2011) (quoting *Reeves v. Fleetwood Homes of Fla., Inc.*, 889 So. 2d 812, 822 (Fla. 2004)). "The last two elements are jurisdictional and must

be analyzed before the court may even consider the first element." *Williams*, 62 So. 3d at 1132. "The last two prongs together are 'referred to as irreparable harm.'" *Univ. of Fla. Bd. of Trs. v. Carmody*, 372 So. 3d 246, 252 (Fla. 2023) (quoting *Nader v. Fla. Dep't of Highway Safety & Motor Vehicles*, 87 So. 3d 712, 721 (Fla. 2012)). As explained below, the State fails to establish element (1) and element (2). Because element (2) is jurisdictional, I address it first. *See Williams*, 62 So. 3d at 1132.

## II.A.

After the decision in *State v. Victorino*, 372 So. 3d 772 (Fla. 5th DCA 2023), the State filed a motion (essentially the same motion that was denied in this case) in *State v. Waldon*, No. 53-2020-CF-008751-A000-XX (Fla. 10th Cir. Ct.). That motion was granted—**by the same trial judge in this case**. In its order in *Waldon*, the trial court pointed out that it had rendered the order in this case prior to *Victorino*. The trial court found that *Victorino* squarely addressed the issues, concluded that it was bound by *Victorino* because there was no interdistrict conflict, and granted the State's motion in *Waldon*. The State filed a copy of that order with us. The *Waldon* order indisputably shows that the trial court will vacate the order in this case if the State simply moves to vacate it based on *Victorino*. Thus, we should dismiss the petition because the State fails to establish that the challenged order injures it "for the remainder of the case." *Williams*, 62 So. 3d at 1132 (element (2)).

## II.B.

Element (2) also requires the State to establish that the challenged order resulted in "material injury." *Id.* To do that, it must clearly and specifically

18

demonstrate that its case has been significantly impaired. *See State v. Pettis*, 520 So. 2d 250, 253 (Fla. 1988) (explaining that certiorari jurisdiction exists to permit the review of pretrial orders "which effectively negate [the state's] ability to prosecute."); *see also CPPB, LLC v. Taurus Apopka City Ctr., LLC*, 375 So. 3d 327, 330 (Fla. 6th DCA 2023) ("[*G*]*eneralized* allegations of harm [are] insufficient to invoke a district court's certiorari jurisdiction . . . . [I]t [is] incumbent upon [the petitioner] to explain how it would suffer irreparable harm . . . ."); *State v. Gerry*, 855 So. 2d 157, 165 (Fla. 5th DCA 2003) (Torpy, J., dissenting) ("[T]he state is obligated to proffer facts or point to record evidence from which we can reach [the] conclusion [of significant impairment] without speculation.").

The State misses the mark. It makes conclusory statements that it "will be irreparably harmed" because it "has no basis to challenge this ruling on appeal" and "may have no recourse if a life sentence is imposed." The State fails, however, to clearly and specifically explain how it has been materially injured. It does not cite any authority holding that if it has no appellate remedy, then, *ipso facto*, it has suffered a material injury. Therefore, dismissal is required because the petition is insufficient to establish material injury. *See Williams*, 62 So. 3d at 1132; *CPPB, LLC*, 375 So. 3d at 329-30.

Dismissal is also warranted because the State fails to disclose what evidence of aggravating factors it has or explain how its case has been significantly impaired. *See Pettis*, 520 So. 2d at 253. "How are we to conclude that the lower court's decision 'effectively negates [the State's] ability to prosecute' [Lobato] when we are

19

left in the dark about the nature and extent of the [evidence of aggravating factors] against [Lobato]?" *Gerry*, 855 So. 2d at 165-66 (Torpy, J., dissenting). The State provides no answer. We should provide no relief.

III.A.

As a threshold matter, the State has waived any right to certiorari relief. The First District's excellent summary of fundamental principles deserves to be quoted in full:

> An appellate court is "not at liberty to address issues that were not raised by the parties." *Anheuser-Busch Co., Inc. v. Staples*, 125 So. 3d 309, 312 (Fla. 1st DCA 2013). Nor may an appellate court "depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention." *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983) (on motion for rehearing); *see also D.H. v. Adept Cmty. Servs., Inc.*, 271 So.3d 870, 888, S539, 2018 WL 5660595 (Fla. Nov. 1, 2018) (Canady, C.J., dissenting) ("[I]t is not the role of the appellate court to act as standby counsel for the parties."). Instead, an appellate court must confine its decision to the issues raised in the briefs. *See Bainter v. League of Women Voters of Fla.*, 150 So. 3d 1115, 1126 (Fla. 2014) ("Basic principles of due process"—to say nothing of professionalism and a long appellate tradition—"suggest that courts should not consider issues raised for the first time at oral argument" and "ought not consider arguments outside the scope of the briefing process.") (quoting *Powell v. State*, 120 So. 3d 577, 591 (Fla. 1st DCA 2013))); *Redditt v. State*, 84 So. 2d 317, 320 (1955) ("The function of an assignment of error is to point [to] the specific error claimed to have been committed by the court below, in order that the reviewing court and opposing counsel may see on what point the appellant seeks reversal and to limit argument and review to such point."); *T.M.H. v. D.M.T.*, 79 So. 3d 787, 827 (Fla. 5th DCA 2011) (Lawson, J., dissenting) ("Judicial restraint serves as the essential self-imposed 'check' against the judicial branch's abuse of power. ..."). For an appellant to raise an issue properly on appeal, he must raise it in the initial brief. Otherwise, issues not raised in the initial brief are considered waived or abandoned. *See Hall v. State*, 823 So. 2d 757, 763

20

(Fla. 2002) (finding procedurally barred argument made in appellant's reply brief that was not raised in the initial brief), *abrogated on other grounds by Norvil v. State*, 191 So. 3d 406 (Fla. 2016); *City of Miami v. Steckloff*, 111 So. 2d 446, 447 (Fla. 1959) ("An assigned error will be deemed to have been abandoned when it is completely omitted from the briefs."); *J.A.B. Enter. v. Gibbons*, 596 So. 2d 1247, 1250 (Fla. 4th DCA 1992) ("[A]n issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief."); Philip J. Padovano, Waiver, 2 Fla. Prac., App. Practice § 8:10 (2017 ed.) ("Failure to pursue the argument on appeal or review is a waiver of the point.").

*Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc) (footnote omitted).

Here, the trial court ruled that application of section 921.141, as amended, would violate the ex post facto clause of the United States Constitution **and** the ex post facto clause of the Florida Constitution. *See* Art. I, § 10, Fla. Const. ("No . . . ex post facto law . . . shall be passed.") (the "Florida Ex Post Facto Clause"). The State argues against the ruling based on the ex post facto clause of the United States Constitution. It fails, however, to argue that the ruling based on the Florida Ex Post Facto Clause departed from the essential requirements of the law. The State also fails to cite the Florida Ex Post Facto Clause or any case interpreting it. Therefore, fundamental principles compel us to deny the petition because the State has waived any right to claim that the trial court's ruling based on the Florida Ex Post Facto Clause departed from the essential requirements of the law. *See Rosier*, 276 So. 3d at 406; *see also Jones v. State*, 279 So. 3d 342, 348-49 (Fla. 5th DCA 2019) (affirming the denial of a motion to suppress based on two grounds because appellant abandoned any claim of error by not making argument against one of the grounds).

21

III.B.

Even if there was no waiver, we must reject the petition because the State fails to establish a departure from the essential requirements of the law. We can make that finding "*only when there has been a violation of a clearly established principle of law* resulting in a miscarriage of justice." *Garcia*, 350 So. 3d at 326 (quoting *Combs v. State*, 436 So. 2d 93, 96 (Fla. 1983)); *see also Pettis*, 520 So. 2d at 254 (same). Of course, a Florida appellate court's interpretation of the Florida Constitution is binding on a trial court.

The State's petition, however, fails to point to a single binding decision interpreting the Florida Ex Post Facto Clause that the trial court departed from when it rendered the challenged order. As a result, we must deny relief. *See Garcia*, 350 So. 3d at 326-27 ("[W]e cannot say the trial [court departed] from the essential requirements of the law . . . . [T]his case may . . . pose questions we have not previously answered . . . or for which there was no clearly established law binding on the trial court . . . . Nor have we . . . conclusively addressed the scope of [constitutional] protections in [this context]."); *Citizens Prop. Ins. Corp. v. San Perdido Ass'n*, 104 So. 3d 344, 355-56 (Fla. 2012) ("Unfortunately, there is no Florida case squarely discussing [this legal question]. Without such controlling precedent, we cannot conclude that either court violated a 'clearly established principle of law.'" (quoting *Ivey v. Allstate Ins. Co.*, 774 So. 2d 679, 682 (Fla. 2000) (quoting *Stilson v. Allstate Ins. Co.*, 692 So. 2d 979, 982-83 (Fla. 2d DCA 1997)))).

IV.

22

In any event, we may decline to grant the State's petition even if it has established a departure from the essential requirements of the law. *See Williams*, 62 So. 3d at 1133. The purpose of certiorari review is to "allow a court to reach down and halt a miscarriage of justice where no other remedy exists." *Id.* As explained *supra* (section II.A.), the trial court will set aside the challenged order if the State simply asks. But it hasn't asked. The State should not obtain **extraordinary relief** from us because it has refused to obtain **certain relief** from the trial court. We should deny the petition.

———————————————

Ashley Moody, Attorney General, Tallahassee, and Doris Meacham, Senior Assistant Attorney General, Daytona Beach, for Petitioner.

Howard L. "Rex" Dimmig, II, Public Defender, and Rachel P. Roebuck and Steven L. Bolotin, Assistant Public Defenders, Bartow, for Respondent.