**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 25-2807, 25-2916
_____


UNITED STATES OF AMERICA,
                                        Appellant
v.

RICHARDSON DANGLEBEN, JR.,
a/k/a Richard Dangleben, Jr.
_____


On Appeal from the District Court of the Virgin Islands
(D.C. No. 3:23-cr-00072-001)
District Judge: Honorable Robert A. Molloy
_____


Argued December 9, 2025

Before: HARDIMAN, BIBAS, and PORTER, *Circuit Judges*

(Filed: June 1, 2026)

———————————

OPINION OF THE COURT

———————————

HARDIMAN, *Circuit Judge*.

This appeal involves two unrelated questions of first impression. First, can a district court set and enforce a deadline by which the Government must give notice of its intent to seek the death penalty under 18 U.S.C. § 3593(a)? We hold that it can. Second, are Virgin Islands territorial offenses predicate "crime[s] of violence" under 18 U.S.C. § 924(c)(1)(A)? We hold that they are.

I

A

Richardson Dangleben, Jr. was charged in Virgin Islands Superior Court for first-degree murder and for using a firearm in the commission of a crime of violence. Dangleben was granted pretrial release provided that he not possess any firearms, ammunition, or dangerous weapons.

The decision to release Dangleben before trial proved fatal. Just four months after he was charged with first-degree murder, Dangleben engaged in a shootout with police on St. Thomas. Dangleben was shot several times but survived. Virgin Islands Detective Delberth Phipps, Jr. was not so fortunate. He suffered a single gunshot wound and died about an hour later. Inside Dangleben's car, law enforcement found a loaded handgun, ammunition, and 300 grams of marijuana.

2

B

On October 13, 2023, a federal grand jury indicted Dangleben. As relevant here, Count One charged him with using a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j)(1). Because the underlying alleged felony was murder, Dangleben was eligible for the federal death penalty. 18 U.S.C. § 924(j)(1). Counts Two and Three charged him with using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). As required by § 924(c)(1)(A) and (j)(1), the Government also charged Dangleben with several predicate crimes of violence stemming from his alleged killing of Detective Phipps and shootout with another officer. All of these predicate crimes of violence were Virgin Islands territorial crimes, including another first-degree murder charge.

1

After Dangleben was indicted, the Federal Public Defender asked an Assistant United States Attorney assigned to the case whether he would seek the death penalty. The AUSA responded that the office "would *not* be recommending the death penalty" to the Attorney General. Dist. Ct. Dkt. No. 146-1, at 2–3 (emphasis added). In reliance on that response, Dangleben did not then exercise his right to the "prompt[]" appointment of two attorneys, at least one of whom "shall be learned in the law applicable to capital cases." *See* 18 U.S.C. § 3005. Both parties understood, however, that the Attorney General—not the local U.S. Attorney's Office—had the ultimate authority to decide whether the Government would seek the death penalty.

At a status conference on November 8, 2023, the District Court asked the Government whether it intended to seek the death penalty and, if so, when it would file a notice of intent as required by 18 U.S.C. § 3593.[1] The AUSA responded that the "final decision is going to be coming from Washington" but he was "confident" that the Government would have "an answer" within 60 days. Supp. App. 4–5. Dangleben then asked the Court to set a 60-day deadline for the Government to decide whether "to file any 3593 Notice." Supp. App. 11. Describing that deadline as "[e]minently reasonable," the AUSA "join[ed] in that request. *Id.*

Given the parties' agreement, the District Court ordered the Government to "file any notice pursuant to 18 U.S.C. § 3593(a) no later than January 12, 2024." Dist. Ct. Dkt. No. 35. The parties then filed a joint proposed scheduling order that included, among other things, an October 2024 (or later) trial date. The Court adopted the jointly proposed dates and reset trial for October 28, 2024.

---

[1] In cases with capital-eligible charges where "the [G]overnment believes that the circumstances of the offense are such that a sentence of death is justified," § 3593(a) requires the Government to "file with the court" at "a reasonable time before the trial" "a notice" that states (1) "the [G]overnment believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the [G]overnment will seek the sentence of death"; and (2) sets "forth the aggravating factor or factors that the [G]overnment, if the defendant is convicted, proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(1)–(2).

On the day its "seek" decision was due, the Government asked for more time. The AUSA explained that his "unfamiliarity with the Capital Case review process led [him] to believe that this issue could be addressed more expeditiously." Dist. Ct. Dkt. No. 40, at 1. Counsel apologized and told the District Court that he had "requested that the process be expedited and, in any event, will file any notice by no later than February 12." *Id.* While noting that the Government had "acquiesce[d] to the January 12, 2024 notice deadline, which had the practical effect of ratifying the reasonableness of the deadline imposed," the Court gave the Government its extra month. Dist. Ct. Dkt. No. 46, at 5 (citation modified). But the Court warned that no further extension would "be entertained absent exigent circumstances and supporting evidence." *Id.*

On February 7, 2024, the Government filed a notice with the District Court that the United States "*will not seek* the death penalty for Richardson Dangleben, Jr." Dist. Ct. Dkt. No. 47 (emphasis added). Given this filing, Dangleben again had no reason to exercise his right to learned counsel. Over the next several months, both sides sought and received various extensions for pretrial matters, and the Court said that it would reschedule trial after it held an omnibus motions hearing.

A little more than a year after it had represented to the Court that it would not seek the death penalty, on February 12, 2025, the Government moved to stay proceedings for 120 days "to review [its] no-seek decision in this capital-eligible case."

5

App. 85.[2] Given the Government's indication that it was reevaluating its seek determination, Dangleben requested appointment of learned counsel. "As a practical matter," Dangleben argued, the Government's motion has "returned this arguably capital-eligible case to square one." Dist. Ct. Dkt. No. 129, at 6 (footnote omitted). "Notwithstanding" his objection to the Government's stay request, Dangleben requested a "brief delay" to give learned counsel 15 days after appointment to "familiarize herself with the case sufficiently"

_____

[2] On January 20, 2025, almost a year after the Government filed its notice stating that it would not seek the death penalty, President Trump signed an Executive Order titled "Restoring the Death Penalty and Protecting Public Safety." Exec. Order. No. 14,164, 90 Fed. Reg. 8463 (Jan. 20, 2025). The Executive Order directed the Attorney General, "where consistent with applicable law," to "seek the death penalty regardless of other factors for every federal capital crime involving" the "murder of a law-enforcement officer." *Id.* About two weeks later, on February 5, the Attorney General issued a memorandum titled "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions." App. 87. That memo directed the Attorney General's Capital Review Committee "to review no-seek decisions in all pending capital-eligible cases" that were charged during the previous Administration and determine "whether additional capital charges are appropriate." App. 89. The memo further stated that, "[a]bsent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving the murder of a law-enforcement officer," App. 88, and "[p]articular attention shall be paid" to "capital crimes committed" "within the federal special maritime and territorial jurisdictions." App. 89.

6

to address the Government's motion. *Id.* at 8 (emphasis omitted).

Twelve days after the Government's motion to stay the proceedings, the District Court appointed learned counsel. Dangleben's original counsel filed a declaration stating that he would not have moved to extend the deadlines for motions and expert disclosures—which had the practical effect of delaying the October 2024 trial date—"[h]ad [he] thought that continuing those deadlines could lead to reversal of the no-seek notice." Dist. Ct. Dkt. No. 146-1, at 6. The declaration also stated that, because "[a]t no time between February 7, 2024 and January 19, 2025 did [G]overnment counsel communicate any intent to seek the death penalty," Dangleben's counsel had not requested learned counsel or pursued any mitigation investigation. *Id.* at 6–7.

In mid-April, the Government filed a superseding indictment that added the eligibility factors under 18 U.S.C. § 3591(a), as well as two aggravating factors necessary to impose capital punishment under 18 U.S.C. § 3592(c). The Government also added a federal predicate to Count One. By this point, the District Court still had not set a new trial date.

On May 16, 2025, the District Court denied the Government's stay request. *United States v. Dangleben*, 2025 WL 1423842, at *1 (D.V.I. May 16, 2025). Then, five days later, the Government filed a notice to seek the death penalty for Count One. Dangleben moved to strike the seek notice.

The District Court granted Dangleben's motion to strike the Government's seek notice for five reasons. *United States v. Dangleben*, 2025 WL 2647195, at *8 (D.V.I. Sept. 15, 2025). Relevant here, the Government's seek notice violated the

7

Court-ordered deadline. *Id.* at *3–4. "The Government," the Court explained, "cannot dispute that the Court and the parties proceeded for over twelve months under the impression that the Government would not be seeking the death penalty." *Id.* at *3. Although § 3593 "is silent regarding any notice to be filed by the [G]overnment in the event it elects not to seek the death penalty," the Court reasoned that its inherent power to control its own docket extended to "setting and enforcing deadlines, including a deadline for filing a Section 3593 notice." *Id.* Because the Government filed its seek notice "well over a year after the Court-extended deadline of February 12, 2024," the notice "clearly violate[d]" that deadline. *Id.*

2

Separate and apart from the weighty issue of the death penalty, Dangleben moved to dismiss Counts One, Two, and Three of the Superseding Indictment, arguing that only federal crimes, not territorial offenses, can be "crime[s] of violence" under 18 U.S.C. § 924(c)(1)(A). The Government countered that territorial crimes of violence can qualify as § 924(c) predicates because the District Court of the Virgin Islands has jurisdiction over certain territorial offenses under 48 U.S.C. § 1612(c), so those offenses "may be prosecuted in a court of the United States" as § 924(c) requires.

The District Court agreed with Dangleben. According to the Court, "Virgin Islands offenses cannot support a charge under Section 924(c)." *United States v. Dangleben*, 2025 WL 2724050, at *7 (D.V.I. Sept. 25, 2025). Because Counts Two and Three alleged only territorial predicate offenses, those Counts had to be dismissed. Count One, however, alleged territorial and federal predicate offenses, so it "remain[ed] a

8

viable offense" even after the territorial predicates were stricken. *Id.*

The Court recognized that the District Court of the Virgin Islands "is considered a 'court of the United States' for purposes of Title 18." *Id.* at *4 (quoting 18 U.S.C. § 23). And under 48 U.S.C. § 1612(c), "the District Court of the Virgin Islands has concurrent jurisdiction over local Virgin Islands offenses if those offenses arise out of the same transaction as a federal offense." *Id.* So "the plain and unambiguous language of Section 924(c)," the Court recognized, "would allow Virgin Islands felony offenses to serve as predicate offenses in cases prosecuted in the District Court of the Virgin Islands." *Id.*

Despite the statute's text, the Court refused to apply it as written. According to the Court, it would be "absurd" for "Virgin Islands defendants" to be "prosecuted under a version of a federal offense not available in any other federal court" and "subjected to harsher punishment." *Id.* at *5. The Government's pursuit of the death penalty here "highlight[ed]" the absurdity, the Court thought, because it would be "nonsensical, oxymoronic, and certainly inconsistent" that "a Virgin Islands defendant could be subject to the death penalty in federal court for committing a Virgin Islands crime when the laws of the Virgin Islands do not allow for the penalty of death." *Id.*

The District Court also supposed that the "policy reasons" behind § 924(c) and § 1612(c) "support[] a finding of legal absurdity and disregarding the plain language." *Id.* at *6. "Congress passed Section 924(c)," the Court suggested, "to prevent the carrying and use of firearms in the commission of *federal* felonies," whereas Congress passed § 1612(c) for the "wholly unrelated" purpose of obviating the need to try "in

9

different courts aspects of the same offenses or closely related offenses." *Id.* (citations omitted). So the Court concluded that "[t]here is no indication that Congress enacted Section 1612(c) for the purpose of allowing local Virgin Islands offenses to serve as predicate offenses under Section 924(c)." *Id.*

II[3]

The Government timely appealed the District Court's order granting the motion to strike the seek notice and its order dismissing several counts in the indictment. We consolidated the appeals and begin with the question of our jurisdiction.

"In general," the Government "may appeal in a criminal case only as permitted by the Criminal Appeals Act, 18 U.S.C. § 3731, which limits appeals to cases involving the dismissal of charges, suppression or exclusion of evidence, return of seized property, or release of a defendant." *United States v. Mitchell*, 652 F.3d 387, 392 (3d Cir. 2011) (en banc). "[D]ismissal of the death penalty notice" is, "in effect, a partial dismissal of the charge," so its appeal falls within § 3731. *United States v. Bass*, 266 F.3d 532, 535 (6th Cir. 2001), *rev'd on other grounds*, 536 U.S. 862 (2002). *Accord United States v. Quinones*, 313 F.3d 49, 57 (2d Cir. 2002); *United States v. Acosta-Martinez*, 252 F.3d 13, 16–17 (1st Cir. 2001); *United States v. Cheely*, 36 F.3d 1439, 1441 (9th Cir. 1994); *United States v. Woolard*, 981 F.2d 756, 757 (5th Cir. 1993).

We join the chorus now and hold that § 3731 authorizes the Government to appeal an order that strikes a notice of intent to seek the death penalty. As the Fifth Circuit explained long

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231 and 48 U.S.C. § 1612(a), (c).

10

ago, an order striking the death penalty "[is] in every practical way as much of an alteration from the grand jury's charge as the striking of predicate acts" because it "remove[s] a discrete basis of criminal liability." *Woolard*, 981 F.2d at 757. Or, as the First Circuit put it, "[b]y striking a statutorily authorized penalty, the district court effectively dismissed a significant portion of the counts against the defendants" and "[t]he order appealed from has significant consequences for the trial of the case," which are "every bit as important as the consequences from striking a count in an indictment." *Acosta-Martinez*, 252 F.3d at 16. Those consequences include, for example, that a capital defendant is entitled to extra peremptory challenges, Fed. R. Crim. P. 24(b)(1), and to two attorneys, at least one of whom is learned in capital cases, 18 U.S.C. § 3005. *See Cheely*, 36 F.3d at 1441; *Acosta-Martinez*, 252 F.3d at 17. And a capital defendant has the right to bifurcated jury proceedings in the guilt and penalty phases. 18 U.S.C. § 3593(b). For its part, the Government may seek a death qualified jury. *See Uttecht v. Brown,* 551 U.S. 1, 9 (2007); *White v. Wheeler*, 577 U.S. 73, 77 (2015) (per curiam).

We also have collateral order jurisdiction over the District Court's order under 28 U.S.C. § 1291. First, the District Court's order "conclusively determine[d] the disputed question": whether this case can proceed as a capital case. *Geo Grp., Inc. v. Menocal*, 146 S. Ct. 774, 781 (2026) (citation omitted). Second, the order "resolve[d] an important issue completely separate from the merits," *id.* (citation omitted), because it did not resolve "whether or not the accused is guilty of the offense charged," *Abney v. United States*, 431 U.S. 651, 659 (1977). In arguing that the Government cannot seek the death penalty here, Dangleben "makes no challenge whatsoever to the merits of the charge against him." *Id.*

11

"Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him." *Id.* Third, the District Court's order is "effectively unreviewable on appeal from a final judgment." *Geo Grp.*, 146 S. Ct. at 781 (citation omitted). If Dangleben is convicted on Count One after a non-capital trial, the Double Jeopardy Clause would bar the Government from retrying him for the capital version of that crime, *see Brown v. Ohio*, 432 U.S. 161, 165–66 (1977), unless Dangleben obtained reversal on grounds other than sufficiency of the evidence. *See Burks v. United States*, 437 U.S. 1, 15–18 (1978). Dangleben concedes as much. So a seek order "involve[s] a right that would be irretrievably lost absent an immediate appeal." *Geo Grp.*, 146 S. Ct. at 783 (citation omitted).

## III

Having established our jurisdiction, we turn to the District Court's order striking the Government's death penalty notice under 18 U.S.C. § 3593(a)(1).

## A

If the Government wishes to pursue the death penalty for a capital-eligible offense, it must file a notice that it "will seek the sentence of death" at "a reasonable time before the trial." 18 U.S.C. § 3593(a). The Government is not statutorily required to state that it will *not* seek the death penalty. But what if a court orders the Government to file a seek notice and the Government represents to the court that it will *not* seek the death penalty? Common sense, fair play, and basic criminal procedure all require that the court can enforce the Government's promise.

12

The Government disagrees, contending that the District Court violated § 3593(a) because the statute requires only that a death notice be filed "a reasonable time before the trial." Gov't Br. 36 (quoting 18 U.S.C. § 3593(a)). But as the Government also acknowledges: "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." Gov't Br. 35 (quoting *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016)). For that reason, "we accord district courts great deference with regard to matters of case management." *Drippe v. Tobelinski*, 604 F.3d 778, 783 (3d Cir. 2010). Yet that inherent authority "cannot contradict any express rule or statute" and "must be a reasonable response to the problems and needs confronting the court's fair administration of justice." *Dietz*, 579 U.S. at 45–46 (citation modified).

Mindful of the black-letter law just noted, we first consider whether § 3593(a) precludes or otherwise displaces a district court's inherent power to set a deadline by which the Government must notice if it will seek the death penalty. It does not. Recall that § 3593(a) directs the Government to file a seek notice "a reasonable time before the trial." What constitutes a "reasonable time" will vary from case to case and is committed to the sound discretion of the trial judge. So we hold that § 3593(a) does not displace a district court's inherent power to manage its cases to ensure a just and fair resolution. In fact, the requirement that the Government file a seek notice within "a reasonable time" will sometimes require the district court to police that line. *See* 18 U.S.C. § 3593(a).

Setting a seek deadline is sensible for at least three reasons. First, it allows the court to manage the case fairly and efficiently from start to finish. Second, it helps counsel litigate the case effectively. Third, it ensures that defendants' rights are

protected. *See, e.g.*, 18 U.S.C. §§ 3005 (authorizing learned counsel), 3599(a) (authorizing counsel, investigative, and expert services for indigent defendants).

Apart from those considerations, consider the practical effect of the Government's position. If the Government had *carte blanche* to revoke its no-seek decisions, defense counsel would have to make decisions about staffing, discovery, and trial strategy as if the case would have a guilt and a penalty phase even after the Government affirmed that it was *not* seeking the death penalty. The waste of time and expense in those circumstances is obvious.

All these reasons apply in this case. Dangleben sought, and the Court granted, various extensions for pretrial matters. Yet he would not have done so "[h]ad [he] thought that continuing those deadlines could lead to reversal of the no-seek notice." Dist. Ct. Dkt. No. 146-1, at 6. And given the Government's no-seek representation, Dangleben had no reason to exercise his right to learned counsel or prepare for his mitigation hearing. For the same reasons a court can generally set and enforce deadlines, it was not unreasonable—not an abuse of discretion—for the District Court to hold to that deadline in this case. *See United States v. Wright*, 913 F.3d 364, 369 (3d Cir. 2019).

The Government argues that even if the District Court had the power we just described, its February 2024 deadline was no longer "reasonable" because it was tied to a trial date that did not hold. But the parties always knew that the seek decision and trial date were connected, either because a seek notice would mean the need for more time to prepare for a capital trial, or because a no-seek notice would result in an earlier trial. At the November 8, 2023 status conference, the

14

Court set the original January 2024 seek deadline. The parties then submitted a joint proposed scheduling order with a trial date and other pretrial deadlines, "[p]resuming" that the Government "does not provide notice pursuant to 18 U.S.C. § 3593(a)." Dist. Ct. Dkt. No. 37, at 2; *see also id.* at n.2 ("These dates all presume that the [G]overnment does not provide section 3593(a) notice."). But the order stated: "[i]f the [G]overnment does provide notice" by the deadline, "all dates will need to be revisited." *Id.* at n.2. The Government's own statements and representations buttress our conclusion that the District Court did not abuse its discretion in enforcing the February 12, 2024 seek deadline.

B

None of the Government's remaining counterarguments persuades. To begin, the Government does not point us to any authority suggesting that district courts may not set and enforce seek deadlines. As the District Court for the Virgin Islands has observed, it is "not unusual for courts to set Section 3593 Notice deadlines even in the absence of a concrete trial date." *United States v. Cole*, 799 F. Supp. 3d 438, 450 n.9 (D.V.I. 2025); *see also, e.g.*, *United States v. Meehan*, 2026 WL 447431, at *2–5 (S.D. Ind. Feb. 17, 2026); *United States v. Suarez*, 801 F. Supp. 3d 872, 876–80 (N.D. Cal. 2025); *United States v. Rivas-Moreiera*, 2023 WL 11960650, at *1–2 (E.D. Tex. Oct. 7, 2023).

The Government also contends that the District Court's seek deadline impeded the Executive's "exclusive authority and absolute discretion to decide whether to prosecute a case." Gov't Br. 37 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). We agree that "the Executive Branch has 'broad discretion as to whom to prosecute,'" and that "this discretion

15

'rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.'" *Wright*, 913 F.3d at 373 (quoting *Wayte v. United States*, 470 U.S. 598, 607–08 (1985)). But the District Court here understood and respected the Government's prerogative to pursue the death penalty. During a status conference some four months after Dangleben's initial appearance, the Court solicited the Government's view as to "the timeframe" for a seek notice. Dist Ct. Dkt. No. 46, at 2. The Government represented that 60 more days to issue a notice was "[e]minently reasonable," Supp. App. 11, and the Court set a deadline of January 12, 2024. The Court then granted—over a defense objection—the Government's request for an extension of that deadline to February 12, 2024, due to what the AUSA admitted was his misunderstanding of the "complex nature of the Justice Department protocol" regarding the decision to seek the death penalty. Dist. Ct. Dkt. No. 46, at 2, 5. At no time did the Court attempt to review the Government's death penalty decision or to interfere with its decisionmaking process. The Court "simply set a reasonable deadline regarding an important issue and expected compliance with that deadline." *United States v. Spurlock*, 782 F. Supp. 3d 987, 1007 (D. Nev. 2025), *appeal dismissed*, 2025 WL 2319947 (9th Cir. June 11, 2025).

So the issue is not, as the Government frames it, "whether to seek the death penalty" falls within the purview of the Executive Branch; it does. Gov't Br. 28 (citation omitted). Instead, the issue is whether courts have the right to manage their cases; they do. *Cf. United States v. Slone*, 969 F. Supp. 2d 830, 832, 835–38 (E.D. Ky. 2013) (rejecting the defendant's request to set a deadline involving part of DOJ's internal Death Penalty Protocol, but indicating that it could set a seek

deadline, which directly affects "the Court's administrative concerns").

The Government suggests it can contravene a district court's order setting or enforcing a seek deadline because its seek reversal is analogous to a superseding indictment. To be sure, a prosecutor's "initial decision should not freeze future conduct," because courts cannot "presume that every case is complete at the time an initial charge is filed." *United States v. Goodwin,* 457 U.S. 368, 382 & n.14 (1982). But analogizing a superseding indictment to the Government's attempt to contravene its representation to the Court that it would not seek the death penalty a year after the Court's deadline overlooks the differences between an ordinary and a capital trial. This is particularly so here, where the Court set a seek deadline at Dangleben's request that the Government joined.

The Government also attempts to analogize its seek reversal to a case where new evidence compels a change in position. This analogy is a nonstarter because Dangleben's case does not involve new evidence. As the District Court explained, the Government's about-face was not "based on new information that wasn't previously available to the Government," and there were no "significant case-related developments" between the no-seek and death notices. *Dangleben*, 2025 WL 2647195, at *2. As the Government candidly admitted, its reversal of position stemmed from its "fail[ure] to properly evaluate the appropriate penalty based on the available evidence." Gov't Br. 38.

To sum up: The Government is correct that it retains "discretion to evaluate the appropriate charges based on known facts." Reply Br. 7–8. But it is equally true that the Government cannot usurp the Court's case-management function. On the

17

facts of this case, the District Court did not abuse its discretion when it struck the Government's very belated (and contradictory) notice to seek the death penalty.[4]

IV

We next turn to whether Virgin Islands territorial offenses can qualify as predicate offenses under 18 U.S.C. § 924(c)(1)(A). We review this question of statutory interpretation de novo. *United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020).

A

Section 924(c) punishes "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). To qualify as a § 924(c) predicate, a Virgin Islands territorial offense must be a (1) "crime of violence" that (2) can be "prosecuted in a court of the United States." Section 924(j) "raise[s] the ceiling of punishments § 924 authorize[s]," *Barrett v. United States*, 146

---

[4] We need not, and do not, address whether the Government's attempted seek notice complies with § 3593(a)'s requirement that such notices be filed a "reasonable time" before trial; whether the Government's attempted seek notice is an "amendment" to its earlier no-seek decision that requires "good cause" under § 3593(a) and, if so, whether the Government can make that showing; or whether permitting the Government to seek the death penalty after it told Dangleben it would not violates Dangleben's Fifth Amendment procedural due process rights.

18

S. Ct. 482, 490 (2026), and permits the Government to seek the death penalty when a defendant, "in the course of a violation of [§ 924(c)], causes the death of a person through the use of a firearm" and "the killing is a murder," 18 U.S.C. § 924(j)(1). Because § 924(j) refers to § 924(c), the "crime[s] of violence" that qualify as predicate offenses under § 924(c) also qualify for § 924(j).

The first requirement is satisfied here. Section 924(c) defines a "crime of violence" as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The definition of a "crime of violence" is not limited to federal offenses but applies to any "felony" that has the required elements. 18 U.S.C. § 924(c)(3). Many territorial offenses so qualify, including several of which Dangleben stands accused—a point he does not contest.

The second requirement is also satisfied. "[E]xcept where otherwise expressly provided," Congress has specified that "the term 'court of the United States' includes" "the District Court of the Virgin Islands." 18 U.S.C. § 23.[5] And territorial Virgin Islands offenses may be prosecuted in the District Court of the Virgin Islands because Congress has granted that court "concurrent jurisdiction with the courts of

---

[5] The District Court for the District of the Virgin Islands is not an Article III court. *United States v. Gillette*, 738 F.3d 63, 70 (3d Cir. 2013). Its jurisdiction flows from Article IV, which empowers Congress to regulate the territories of the United States. U.S. Const. Art. IV, § 3 cl. 2. Still, Congress has chosen to define "court of the United States" to include this territorial court. 18 U.S.C. § 23.

19

the Virgin Islands . . . over those offenses against the criminal laws of the Virgin Islands . . . which are of the same or similar character or part of, or based on, the same act or transaction" that constitutes an offense against federal law. 48 U.S.C. § 1612(c); 18 U.S.C. § 3231. So the District Court of the Virgin Islands has "jurisdiction over charges alleging local crimes that are related to federal crimes." *United States v. Gillette*, 738 F.3d 63, 71 (3d Cir. 2013).

As the District Court recognized, "reading these federal statutes together, it would appear that, in the context of the allegations in this case, the plain and unambiguous language of Section 924(c), [along with] Section 1612(c), would allow Virgin Islands felony offenses to serve as predicate offenses in cases prosecuted in the District Court of the Virgin Islands." *Dangleben*, 2025 WL 2724050, at *4; *see also United States v. Hodge*, 2016 WL 8730657, at *5 (D.V.I. Apr. 15, 2016) (Virgin Islands territorial offenses can be § 924(c) predicates), *aff'd in part and vacated in part* 870 F.3d 184 (3d Cir. 2017). We agree and hold that § 924(c)'s text applies to territorial offenses that can be prosecuted in the District Court of the Virgin Islands.

B

The District Court should have stopped when it concluded that "the plain and unambiguous" text would allow Virgin Islands felony offenses to serve as predicate offenses in cases prosecuted in the District Court of the Virgin Islands. *Dangleben*, 2025 WL 2724050, at *4. "If the words of a statute are unambiguous," then the "first step of the interpretive inquiry is [the] last." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019). Instead, the District Court "disregard[ed] the plain language" because it perceived that reading would lead to a "result that

20

no rational legislature could have intended" and the "policy reasons behind the enactment of Sections 924(c) and 1612(c) support[]" that departure from the text. *Dangleben*, 2025 WL 2724050, at *5–6 (citation modified). Neither rationale supports a holding contrary to the text's ordinary meaning.

The District Court set the bar for absurdity too low. A "result that may seem odd is not absurd," *Cochise Consultancy, Inc. v. United States ex. rel Hunt*, 587 U.S. 262, 271 (2019) (citation modified), and "does not include substantive errors arising from a drafter's failure to appreciate the effect of certain provisions," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 238 (2012). And "[a]s long as Congress could have any conceivable justification for a result—even if the result carries negative consequences—that result cannot be absurd." *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 588 (3d Cir. 2020) (en banc); *see also* Scalia & Garner, *Reading Law*, at 237 (cautioning that "absurdity can be a slippery slope" and "can lead to judicial revision of public and private texts to make them (in the judges' view) more reasonable."). "Anything more would threaten the separation of powers, undermine fair notice, and risk upsetting hard-earned legislative compromises." *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 381 n.3 (2021) (Gorsuch, J., dissenting). As these authorities suggest, the District Court erred when it applied the absurdity doctrine.

For starters, territories are not states. Congress has plenary power over the territories, so some differential treatment between the two is to be expected. "[A]s a United States territory, the U.S. Virgin Islands does not have independent sovereignty but derives such powers as its [G]overnment possesses directly from congressional grant under article IV, section 3 of the federal Constitution." *United*

21

*States v. Hodge*, 870 F.3d 184, 195 (3d Cir. 2017) (citation modified). Given that backdrop, there is nothing absurd about allowing § 924(c) charges to be premised on Virgin Islands territorial crimes of violence that already may be prosecuted in the District of the Virgin Islands, a federal court. 48 U.S.C. § 1612(c). One "conceivable justification" for this result, *Riccio*, 954 F.3d at 588, is that Congress wanted to deter and punish the violent use of firearms in the Virgin Islands by extending the enhanced punishments in § 924(c) and § 924(j) to all offenses over which the District of the Virgin Islands has jurisdiction—territorial and federal.

Similarly, it is not absurd that applying § 924(c) as written in this context "allows federal death penalty prosecutions for wholly local offenses." Dangleben Br. 45. Again, Congress has established a unique jurisdiction for the District of the Virgin Islands. And it is not "nonsensical," *Riccio*, 954 F.3d at 588 (citation modified), that certain territorial offenses, prosecutable in "a court of the United States" as stand-alone crimes, can also trigger separate federal liability—especially given Congress's expansive authority over territories. *Cf. Hodge*, 870 F.3d at 194–95. Finally, the District Court erred when it deemed relevant the fact that the Virgin Islands does not impose the death penalty for territorial crimes. The federal government can seek the death penalty for federal crimes committed even in states that have abolished it. U.S. Const. art. VI, cl. 2; *see United States v. Gabrion*, 719 F.3d 511, 521–24 (6th Cir. 2013) (en banc).[6]

---

[6] The Government's reading is more rational. Dangleben's atextual reading reaches all § 924(c) prosecutions, not just the

It was also error to conclude that "policy reasons" support "a finding of legal absurdity and disregarding the plain language." *Dangleben*, 2025 WL 2724050, at \*6. According to the Court, "[o]ne of the explicit purposes in creating the concurrent jurisdiction statute was 'to obviate the need for trying in different courts aspects of the same offenses or closely related offenses.'" *Dangleben*, 2025 WL 2724050, at \*6 (quoting *Gillette*, 738 F.3d at 71). It reasoned: "[t]here is no indication that Congress enacted Section 1612(c) for the purpose of allowing local Virgin Islands offenses to serve as predicate offenses under Section 924(c)." *Id.* But even if "Congress passed Section 1612(c) for a purpose wholly unrelated to . . . Section 924(c)," *id.*, we must follow the text. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013) (When "the statutory language is unambiguous, the court should not consider statutory purpose or legislative history, because [the Court] operate[s] under the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (citation modified)). For "if Congress has made a choice of language which fairly brings a given situation within a statute," *Riva v. Mitchell*, 460 F.2d 1121, 1124 (3d Cir. 1972) (citation omitted)—as it did in both § 924(c) and § 1612(c)—"a statute is not to be confined to the particular applications contemplated by the legislators," *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) (citation modified). In sum, the District Court's

---

small fraction that are capital-eligible under § 924(j). If Dangleben were right, no territorial crimes of violence could serve as predicates for routine § 924(c) prosecutions. That approach disregards the meaningful differences between territories and states.

23

purposivist arguments fail on their own terms, and cannot supplant the text of § 924(c) and § 1612(c).

C

We acknowledge that two judges in the United States District Court for the District of Columbia have, contrary to the conclusion we reach today, held that local D.C. offenses cannot serve as § 924(c) predicates. *See United States v. Brown*, 58 F. Supp. 3d 115, 118–31 (D.D.C. 2014); *United States v. Mejia*, 657 F. Supp. 3d 123, 134 (D.D.C. 2023). The District of Columbia is on similar footing to the Virgin Islands in this context because its federal district court also exercises jurisdiction over local offenses related to violations of federal law. *See* D.C. Code § 11-502(3). *Brown* resorted to legislative history after finding ambiguous the phrase "may be prosecuted in a court of the United States." 58 F. Supp. 3d at 121–22 (quoting 18 U.S.C. § 924(c)(1)). *Brown* further explained that, "[t]aken most literally (and broadly), the phrase could encompass any crime of violence that *may*—i.e., can possibly—be prosecuted in a federal district court." *Id.* at 122. The court also reasoned that "the language could be read more narrowly (and perhaps more naturally) as simply meaning federal offenses—i.e., only crimes of violence that *themselves* may be prosecuted in federal court *directly* because such court has original jurisdiction over them, a universe limited to federal, U.S. Code offenses." *Id.*

In our view, *Brown*'s analysis is unpersuasive because it "manufacture[d] ambiguity where none exists." *United States v. Culbert*, 435 U.S. 371, 379 (1978). In so doing, *Brown* failed to recognize that § 924(c)(1)(A)'s "most literal[]" meaning is also its "more natural[]" one. *Id.* The District Court here rightly concluded that *Brown*'s reading was

"unpersuasive" because it "requires the insertion of the word 'federal' to modify the word 'offense' in defining the term 'crime of violence'" and "significantly modifies the plain language of the statute." *Dangleben*, 2025 WL 2724050, at \*4 n.7.

Also, the evidence *Brown* examined to purportedly divine Congress's intent does not hold up. The District Court relied on the same evidence, which Dangleben reiterates on appeal: (1) the legislative history of § 924(c); (2) how other courts have interpreted § 924(c). But we have no need to resort to legislative history when the statute's meaning is clear. *Est. of Arrington v. Michael*, 738 F.3d 599, 605 (3d Cir. 2013); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."). And although *Brown* claimed that other courts had interpreted the phrase "'crime . . . for which [the defendant] may be prosecuted in a court of the United States' to mean a federal crime," 58 F. Supp. 3d at 127–28 (collecting cases), these cases either made that remark in passing or resorted to legislative history to support their conclusion.

D

Dangleben's remaining counterarguments fail. First, he contends that we should adopt his reading of § 924(c) on constitutional-avoidance grounds. "[W]hen presented with two 'fair alternatives,'" this canon counsels courts to "adopt[] the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly." *United States v. Davis*, 588 U.S. 445, 463 (2019). But the canon "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Coop.*,

25

532 U.S. 483, 494 (2001). Contra Dangleben, the same is true for the rule of lenity. *See, e.g.*, *United States v. Perez-Colon*, 62 F.4th 805, 811 (3d Cir. 2023). As we have explained, § 924(c) is unambiguous.

Dangleben next contends that the Government's § 924(c) reading creates "vagueness problems." Dangleben Br. 49–50. He argues that a "layperson" would not know § 924(c) "applies differently in the Virgin Islands than elsewhere." Dangleben Br. 50. But the vagueness doctrine applies only where "a criminal law [is] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Here, the relevant statutes give straightforward notice that the District Court of the Virgin Islands is a "court of the United States." 18 U.S.C. § 23. So a defendant can be charged in that court for "offenses against the criminal laws of the Virgin Islands . . . which are of the same or similar character or part of, or based on, the same act or transaction or two or more acts or transactions connected together or constituting part of a common scheme or plan" as a violation of the United States Code. 48 U.S.C. § 1612(a), (c). Nor may he use or carry a firearm during and in relation to "any crime of violence . . . for which [he] may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(1)(A). There is no vagueness here. As the District Court recognized, "the plain and unambiguous language of Section 924(c)" applies to territorial crimes of violence. *Dangleben*, 2025 WL 2724050, at *4.

\*\*\*

For the reasons stated, we will affirm the District Court's order granting the motion to strike the death penalty

26

and will reverse and remand its order dismissing Count Two, Count Three, and three predicate offenses from Count One, with instructions to reinstate those charges.

Adam F. Sleeper **[Argued]**
Office of United States Attorney
District of the Virgin Islands

William A. Glaser **[Argued]**
Criminal Division
United States Department of Justice

*Counsel for Appellant*

Matthew A. Campbell **[Argued]**
Office of Federal Public Defender

Aren K. Adjoian
Brett G. Sweitzer
Katherine C. Thompson
Federal Community Defender Office
for the Eastern District of Pennsylvania

Allison F. Miller
Law Office of Allison Ferber Miller

*Counsel for Appellee*

Renee Pietropaolo
Elisa A. Long
National Association of Federal Public Defenders

*Amicus in Support of Appellee*